Bruckner's lessee *v.* Lawrence.

CHRISTOPHER BRUCKNER'S LESSEE *v.* WOLCOTT LAW-
RENCE.

Where a boundary of land, conveyed by patent from the United States, is described by
course and distance, terminating at a post, and neither any marks indicating such
boundary, nor any post indicating its termination, are to be found on the land, and
no evidence is adduced, showing where such post was originally placed; parol evi-
dence, *that a line was found marked upon the trees upon the land,* but variant
from the call of the patent, and not indicated by the monument called for in the
patent, was the actual line surveyed, run, and marked, as such boundary, by the
government surveyor, will not be admitted, to alter or vary the boundary, as descri-
bed by course and distance in the patent.

In the construction of grants, both course and distance, must give way to natural or
artificial monuments or objects; and courses must be varied, and distances length-
ened or shortened, so as to conform to the natural or ascertained objects, or bounds
called for in the grant; but where there is nothing in the conveyance, to control
the call for course and distance, the land must be run according to the course and
distance given in the description of the premises.

A patent of land from the United States, cannot be impeached in *an action at law*,
on the ground either of *fraud or mistake*, in any of the proceedings required as
prerequisites to its issuing, by one claiming under a subsequent grant.

A grant of land, (except as a release,) is inoperative and void, if, at the time of the
grant, the lands are in the actual possession of another person, claiming under a ti-
tle adverse to that of the grantor.

EJECTMENT tried at the Circuit Court for the county of
Monroe, at the December term, 1840, before the Hon. WM.
A. FLETCHER, Presiding Judge, who reserved certain
questions arising at the trial, and certified them to this
Court for its opinion thereon. The questions reserved ap-
pear in the opinion of the Court.

*J. P. Christiancy*, *H. T. Backus* and *Wm. Woodbridge*,
for plaintiff.

*A. D. Fraser* and *R. McClelland*, for defendant.

RANSOM, J.   This is an action of ejectment brought by the plaintiff to recover the possession of a certain tract of land, described in the declaration.

On the trial of the cause at the Circuit, the plaintiff gave in evidence a patent from the President of the United States, to Geo. McDougal and Israel Ruland, dated July 24, 1811, executed under an act of congress entitled " an act regulating the grant of land in the territory of Michigan," approved March 31, 1807, under which he claimed the lands in question.

The patentees, a few days subsequently to the date of the patent, conveyed the land to Gov. Hull.   In 1815, Gov. Hull conveyed to Elkanah Watson, and May 7, 1835, Watson conveyed to the plaintiff.   The patent describes the land as bounded on the east by a tract confirmed to Rachael Knaggs; on the south by the River Raisin, and on the west and north by unconceded lands of the United States, and more particularly as follows, that is to say :   Beginning at a post on the north border of the River Raisin, at the south west corner of the tract confirmed to Rachael Knaggs, and running on the margin of the river, up stream, 81 degrees west, 9 chains and 65 links; thence along the said margin, up stream, north, 64 degrees west, 11 chains to a post; thence north, 19 degrees east, 299 chains and 92 links, to a post; thence south 71 degrees east, 20 chains and 42 links, to a post, the northwest corner of the tract confirmed to Rachael Knaggs; and thence south, 19 degrees west, 299 chains and 58 links, to the place of beginning; containing 613 and 64-100 acres.   The tract is also designated as No. 428.

The west line of the Rachael Knaggs' tract was not disputed, and it was proved that, running the lines and courses, described in the patent for tract No. 428, on the ground lying west of it as claimed by the plaintiff, no

posts mentioned in the patent, and no monuments indi-
cating a line, could be found: and there was no evidence
to show the points where the posts had been placed, or
that they ever had been placed agreeably to the patent.

A plat was then offered in evidence, by the plaintiff,
purporting to be a true copy of that part of Greeley's con-
nected map of private claims on the River Raisin, which
delineates the surveys adjoining claim No. 428, and also a
map purporting to be a copy of the recorded plat in the
office of the Surveyor General, at Cincinnati, of the public
surveys, (made by Joseph Fletcher,) in township No. 6
south, range 7 east, showing the connection with the wes-
terly line of claim No. 428.   These maps, with the testi-
mony substantiating them, were objected to by the defen-
dant, but admitted by the Court.

The plaintiff further offered in evidence, as proof of
the original field notes of the survey made by Aaron
Greeley, who, as Deputy Surveyor General, surveyed the
private land claims on the River Raisin, a paper writing,
in reference to which it was proved by the Surveyor Ge-
neral and the chief clerk in his office, that they were un-
able to state whether the original field notes of the survey
of private land claims in the, now, state of Michigan,
which were made prior to the year 1815, were ever re-
turned to the office of the Surveyor General; that the sur-
veys were made by Aaron Greeley, and that the field notes
now on file in said office, appear to be transcripts from
the original notes, made and signed by him.   Copies of
similar transcripts of the surveys of several tracts of land
granted for private claims, on the River Raisin, and near
the premises in question, were offered in evidence by the
plaintiff, all which were objected to by the defendant, but
admitted by the Court.

It was further shown by the Surveyor General and his
chief clerk, that the only returns to said office relative to

said claims, or the survey thereof, were the transcripts of the field notes aforesaid, and the connected map before mentioned, of surveys of private land claims, describing them as made by Aaron Greeley.

It was then proved by the defendant, that Aaron Gree-ley surveyed the private land claims on the River Raisin, confirmed under the act of congress of March 3, 1807, and that those surveys were all made in the summer of 1810; that an examination of the lines of the Rachael Knaggs' tract, and of some other lots surveyed by Gree-ley, had been made, and that Greeley's lines were marked upon the trees; that upon examination of such marks, they were found to have been made in 1810; that there was found a full and distinct line of that age parallel with the Rachael Knaggs' tract, at the distance of 9 chains and 37 links west of it, being, according to defendant's claim, the east line of his land, and the west line of lot No. 428; that there was a corner tree, (marked for a corner,) at the northern extremity of the last mentioned line; that a simi-lar line was found running east from this corner tree, to the northwest corner of the Rachael Knaggs' lot, and continuing thence eastwardly, forming the northern boun-dary of her lot. By cutting into the mark on the corner tree before named, there were found the figures 428, marked with an iron, and made at the time of the origi-nal marking.

It was proved, by a witness who assisted Greeley in the original survey of the claims, that said line was actu-ally run and marked by Greeley, as the west line of lot No. 428; that this was the last line run by him; that Gree-ley's uniform custom was, to mark his lines, in said sur-veys, upon the trees; that he never designated such lines or corners by driving stakes; and that he marked the cor-ner trees with an iron.

An examination was made with a view to find a west

line for No. 428, as claimed by the plaintiff, at a distance of 20 chains and 42 links from Rachael Knaggs' west line. It appeared that the greatest part of the distance was timbered land, and of a growth sufficiently large to have received marks in 1810; but such line could no where be found; and that the line upon the north did not extend further west than to the corner tree before mentioned, marked 428.

It was shown, by copies of papers on file in the Land Office at Detroit, that, in the application of McDougall and Ruland, to the Land Commissioners, for allowance of their claim, No. 428, only 560 acres were claimed, whereas their patent covers 613 and 64-100 acres.

It appeared from the same source, that the certificate of confirmation of lot No. 428, was signed by only *one* of the *three* Commissioners, then in office, and acting under the act of congress before referred to. And James Abbott, one of said Commissioners, testified that such certificates were generally signed by at least *two* of the Board; he knew of no instance where it had been otherwise.

The defendant further proved, that the unceded lands belonging to the United States, and upon which lot No. 428 was bounded on the west, were, in 1819, surveyed by Joseph Fletcher, a deputy of the Surveyor General of the district; that such survey extended east, over the west line called for by the patent for tract No. 428, a little more than one half the width of said tract; that the east line of the survey made by Fletcher was run at the distance of 9 chains and 37 links west of the tract confirmed to Rachael Knaggs, and about three or four rods east of the line run by Greeley, in the summer of 1810, as the west boundary of lot No. 428, near the River Raisin; and that the two lines, in running back from the river, converged, so as to meet at a point about half way

from the river to the rear of lot No. 428; from thence to the rear, they coincided.

The defendant purchased of the United States, several lots of land, extending from the River Raisin to the rear of lot 428; all of which lots overlapped the west boundary of No. 428, according to the patent granted to McDougall and Ruland; extending to the east line of the survey made by Fletcher. Of these lots, the defendant had obtained patents from the President of the United States as early as the year 1824, and, at the date of the deed from Elkanah Watson to the plaintiff, and long prior thereto, was, and ever since had continued to be, in the actual, open and peaceable possession of those lots; holding and claiming adversely to Watson and all others, by virtue of his said title and possession. He had built mills and made other valuable improvements thereon. It was further proved that Watson never was in possession of any part of the premises.

The Circuit Court charged the jury, that the evidence given by the defendant, respecting the line, actually run by Greeley, as stated by witnesses, for the west line of lot No. 428, could not control the courses and distances mentioned in the patent; that inasmuch as the patent, and the original survey, designated the land by courses and distances, and called for *posts*, as monuments at the angles of the lots, the defendant, if he claimed a line different from that designated by such courses and distances, was bound to show the posts referred to in the survey and patent, or if they could not now be found, he must prove where they were actually placed; that proof, by oral testimony, that a line found marked upon the trees, was the actual line surveyed, run and marked, as the west line of said lot, by the government surveyor, could not avail. That the returns and field notes given in evidence were conclusive, and, (in the absence of the mon-

uments called for in the patent,) the only guide to be re-
sorted to, and whether an actual location, or survey, had
been made or not, the field notes and return could not be
controverted by parol evidence; that these papers, if the
jury believed the evidence, they were to take as the true
and only returns, made by Greeley in the case, to the of-
fice of the Surveyor General; that if the patent had re-
ferred to a marked line, the defendant might have shown
it to be in a different place from that indicated by the
courses and distances; but that no proof of different kinds
of monuments, indicating said line, could be given, and
that proof of the line marked, was not evidence of the lo-
cation of the monuments called for in the patent and field
notes; that there being evidence in the case that the posts
called for in the patent could not be found, and no evi-
dence showing where they were actually stuck, the plain-
tiff was entitled to have the tract run out according to the
courses and distances mentioned in the patent and survey
of Greeley, and was, therefore, entitled to the whole tract
of land described therein.

The Court also charged the jury, that it was immate-
rial whether the certificate of confirmation, under which
the survey was made, was signed by a majority of the
Board of Commissioners or not, and that the jury could
not enquire whether the certificate and survey under it,
were, or were not, in accordance with the confirmation;
that neither fraud nor mistake in any proceeding anterior
to the issuing of the patent, could be enquired into, or could
affect the results of this trial; and that if the Commission-
ers originally confirmed the patentees in a *three* acre tract
only, and the survey was actually made and the lines
marked in accordance with such confirmation, and after
the survey, the patentee had obtained, by fraud or other-
wise, the certificate of *one* of the Commissioners only, to
such allowance, to be a *seven* acre tract, and said surveyor

Bruckner's lessee *v.* Lawrence.

had made a paper return in accordance therewith, without going upon the land or making an actual survey thereof, and the patent had issued for such *seven* acre tract, still the patentee would, by law, be entitled to the whole tract described in his patent, (if the same could be located on the ground,) to be held according to the description in the patent.

And the Court further instructed the jury, that if they found that the defendant, on the seventh day of May, 1835, the date of Watson's deed, under which the plaintiff claims title, held *any portion* of the land claimed by the plaintiff, by open and adverse possession, they would find for the defendant for *such portion;* on the ground that the deed from Watson, to the plaintiff, for so much of the land as was thus held by defendant, was inoperative and void.

Upon the evidence submitted, and the charge of the Court, the jury found a verdict for the plaintiff for so much of the land claimed by him, as was not shown to have been held adversely by the defendant at the date of Watson's deed, May 7, 1835.

This case presents four several questions for our consideration :

1. Whether the plats and maps, found in the office of the Surveyor General, at Cincinnati, were competent evidence, and properly admitted by the Court, on the trial.

2. Whether the lines and monuments found on the ground, but not corresponding with the calls of the patent, are to control the courses and distances given in the patent.

3. Whether the patent, issued to the plaintiff, can be impeached, for fraud or mistake, in any of the proceedings anterior to the issuing of the patent, in an action at law, by one claiming under a subsequent grant; or whether it is conclusive evidence of the regularity of every step prior to its date; and

4. Whether a deed, executed while a third person is in possession, holding the premises adversely to the grantor, is inoperative and void.

1. From the view we take of the three last questions presented by this case, it is unnecessary to consider the first; we, therefore, declare no opinion upon the competency of the evidence offered by the plaintiff, and, although objected to by the defendant, admitted by the Court.

2. Whether the actual lines and monuments found on the ground, are to control the courses and distances called for in the patent.

The question is in general terms, whether parol evidence was admissible in this case, to explain the patent under which the plaintiff claimed title ; whether the extent of the grant shall be determined by the courses and distances given in the patent, or by the marked line, corner tree, &c. proved by the witnesses, but not called for in the patent.    The general principle, that deeds and other instruments in writing cannot be contradicted, varied or explained, by parol evidence, is established by numerous decisions, and cannot now be denied.    We have only to enquire, therefore, whether the patent in this case is one admitting of explanation on the ground of mistake, or for any other reason.    It would seem, that, unless there be some latent ambiguity in the language of the instrument, in relation to the description of the lands granted, no parol proof is necessary or proper.

Where is the ambiguity in the patent in question ?

A latent ambiguity arises from circumstances, *dehors* the instrument, but there are no such circumstances creating doubt or ambiguity in this case.    The granted premises, are described in the patent, first by general boundaries ; those boundaries are found precisely according to the call.    They are more particularly described, by giving the boundaries on two sides, posts at the corners or angles,

and courses and distances on every side. No posts are found, nor is there any proof, in the case certified, that any were, in fact, ever placed on the ground; on the contrary, the witness stated that Greeley, by whom the grant was surveyed, never drove stakes, but always marked standing trees for the corners. The proposition was not, then, to prove to the jury that there was a disagreement between the courses and distances, and the monuments and boundaries, as given in the patent, and as they are found on the land, but to show that there was an actual line on the ground, not described or called for in the patent, but, in fact, intended by the surveyor, Greeley, as one of the boundaries of the plaintiff's grant. To admit parol proof of a marked line, no where mentioned in the deed, but entirely variant from its calls, would serve to render titles to real estate dependent, not on deeds of conveyance, and the language of the grantor, and courses, distances and monuments, but on the mere memory of witnesses.   5 Greenl. R. 502, (decided in 1829.)

In 5 Greenl. R. 503, the Court say: "It has often been decided by other courts as well as this, that where there are no monuments referred to in a deed of conveyance, or if they are gone, and the place where they originally stood cannot be ascertained, the courses and distances mentioned in the deed, must govern the parties and those claiming under them; for in such case there can exist no latent ambiguity, because no extrinsic facts or circumstances exist to create it."

In deciding the case of *Chinoweth et al.* v. *Lessee of Haskell et al.* 3 Pet. R. 96, (decided in 1830,) Chief Justice *Marshall* used this language: "It is an obvious principle, that a grant must describe the land to be conveyed, and that the subject granted must be identified by the description given of it in the instrument itself. For the purpose of furnishing this description, and of separating the land

from that which is not appropriated, a survey is made."
" The description of the land thus made by a survey is
transferred into the grant.   It consists of the courses and
distances run by the surveyor, and of the marked trees at
the lines and corners, or other natural objects which as-
certain the very land which was actually surveyed.   The
courses and distances are less certain and permanent
guides to the land actually surveyed and granted, than
natural and fixed objects on the ground; but they are
guides to some extent, and, in the absence of all others,
must govern us.   If a grant be made which describes the
land granted by course and distance only, or by natural
objects not distinguishable from others of the same kind,
course and distance, though not safe guides, are the only
guides given us, and must be used."

*McIvers' lessee* v. *Walker et al.* 4 Wheat. 444, (4 Pet.
Cond. 502,) decided in 1819, asserts the same principle.
The Court say : " If nothing exists to control the call for
course and distance, the land must be bounded by the
courses and distances *of the patent,* according to the mag-
netic meridian.   But it is a general principle, that the
course and distance must yield to natural objects called
for in the patent.   All lands are supposed to be actually
surveyed, and the intention of the grant is to convey the
land according to that actual survey ; consequently, if
marked trees and marked courses be found, conformably
to the calls of the patent, or if water courses, or moun-
tains, or any other natural objects, be called for in the pa-
tent, distances must be lengthened or shortened, and
courses varied so as to conform to those objects."

*Boardman et al.* v. *Lessees of Reed et al.* 6 Pet. R. 345,
(decided in 1832;) *Wendell* v. *The People,* 8 Wend. R. 190,
(decided in 1831;) *Jackson ex. dem. Putnam et al.* v. *Bowen,*
1 Caine's R. 358 ; 7 Mass. R. 496 ; 8 Id. 146 ; 4 Greenl.
496, distinctly affirm the principle of the cases previ-

ously above cited. I take it then to be a settled rule, in the construction of grants, that both course and distance must give way to natural or artificial monuments or objects; and courses must be varied and distances lengthened or shortened, so as to conform to the natural or ascertained objects or bounds called for in the grant; but where there is nothing in the conveyance to control the call for course and distance, the land must be run according to the course and distance given in the description of the premises. In *Wendell* v. *The People*, the Chancellor reviews all the cases upon this question, and declares the law to be as above stated. The only case I have found which militates against this rule, is *Conn et al.* v. *Penn et al.* 1 Wash. C. C. R. 497, (decided in 1818.) That was a Circuit opinion of Judge *Washington*, pronounced in a chancery case, and the principle of his decision upon the question now under consideration, has been since overruled, again and again.

3. The next question propounded is, whether the patent issued to the plaintiff, can be impeached for fraud or mistake in any of the proceedings anterior to its date, in an action at law, by one claiming under a subsequent grant?

Upon this question there is, apparently, some conflict of authorities; but we think, on a careful examination of the *grounds* on which the cases are severally decided, there will be found no disagreement upon the general principle involved.

The Circuit Court instructed the jury, that the patent was conclusive of the regularity of the preliminary steps; that neither fraud nor mistake in any of the proceedings anterior to the issuing of the patent, could be enquired into. Was such instruction proper? The defendant alleges it to have been erroneous.

The first case cited by the defendant's counsel, was *Polk's Lessee* v. *Wendal et al.* 9 Cranch, 87; (3 Pet. Cond.

Bruckner's lessee *v.* Lawrence.

R. 286.) That case was ejectment in the Circuit Court for the District of West Tennessee, and the decision was predicated upon a statute of that state, which provides that an *elder* grant founded on a *younger* entry, shall be holden void. The Court held, that, under that statute, the priorities between the parties were examinable at law, and that a *junior* patent, founded on a *prior* entry, shall prevail in ejectment against a *senior* patent, founded on a *junior* entry.

*Huidekoper's Lessee* v. *Burrus*, 1 Wash. C. C. R. 113, (decided in 1804,) is also cited by the defendants. This was ejectment also, brought in the Circuit Court for the Pennsylvania District. The land in dispute was granted under a statute of that state, passed in 1792; and the case seems to have been determined, principally, upon a construction of the peculiar provisions of that statute. Nevertheless, the point involved here, was there drawn in question. In his charge to the jury, Judge *Washington* remarked: " The first point to be considered, is whether a patent is conclusive evidence of the plaintiff's title; because if that be the case, there is no necessity for considering the other points. A patent for land in this country is the act of a public officer, who acts under a special authority, delegated to him by law; and which prescribes the terms upon which it is to be granted. If it is to be granted upon a settlement and improvement, or upon a warrant properly surveyed and located, with settlement, &c., the patent is *prima facie* evidence that every thing is regular; and every thing is to be presumed in its favor, until proof be exhibited to the contrary. If it appear that there was no incipient right by settlement, or warrant and survey, *with* settlement, *as the law directs*, then the patent does not vest a title. The warrant and survey give an incipient title, to be consummated by settlement and residence, of which title the patent is but the evidence."

*Stringer et al.* v. *Young's Lessees et al.* 3 Pet. R. 341, is also relied upon by the defendant's counsel. This, too, was ejectment, under the Virginia land laws. At the trial in the Circuit, the defendants offered proof that the survey on which the plaintiffs' grant was predicated, had not been returned and recorded in the proper office; that the Deputy Surveyor, who made the survey, was not a Surveyor of the county where the land lay, as by law he should be; that the grant issued without any survey having been made, and that the Register of the land-office issued the grant without proper authority, and that the same was therefore void. All which proof the Court rejected. In deciding the case upon error, Chief Justice *Marshall* said: "In Virginia, the patent is the completion of title, and establishes the performance of every prerequisite. No inquiry into the regularity of those preliminary measures, which ought to precede it, is made in a trial at law. No case has shown that it may be impeached at law, unless it be for fraud; not legal and technical, but actual and positive, fraud in fact, committed by the person who obtained it; and even this is questioned." He then proceeds to comment upon several cases decided by the State Courts, and says: "In *Hambledon et al.* v. *Wells,* reported in a note to 1 Hen. & Mumf. R. 307, the defendants offered evidence to prove that the grant under which plaintiff claimed, was defective in several prerequisites to a patent. The Court of Appeals in Virginia overruled these objections; but determined that the Court below erred in not permitting the appellants to give evidence that the plaintiff procured the plat on which the patent was obtained, to be returned to the office, knowing that an actual survey had *not* been made." The Chief Justice adds: "In this case the objectionable act was a fraud *knowingly* committed by the patentee himself. Even this case has been ques-

Bruckner's lessee *v.* Lawrence.

tioned, though not, as far as is known, expressly over-ruled.

In *Witherington* v. *McDonald*, 1 Hen. & Mumf. R. 306, the defendant offered evidence to show that the survey upon which plaintiff's patent was founded, was illegal; and also that the patent was obtained upon a certificate signed by one Lewis, *as clerk* of the land-office, instead of being signed by the Register or his Deputy, as is required by law. The testimony was rejected; the defendant appealed; and the judgment was *unanimously* affirmed by the Court of Appeals. In the course of the trial, the case of *Hambledon* v. *Wells*, was mentioned by several of the judges with disapprobation; and it was said, that a single case, decided by three judges against two, was not considered as conclusively settling the law."

The case of *Hoofnagle* v. *Anderson*, 7 Wheat. R. 212, is cited in the same opinion. That was a suit in Chancery, brought to obtain a conveyance for a tract of land in the Virginia military reserve, in the state of Ohio, for which the defendant had obtained a patent. After its emanation, the plaintiff had located a military land warrant on the same land, issued for services performed by an officer in the Virginia line, on the *continental* establishment. The services performed by the officer on whose warrant the defendant's patent had been issued, were in the *state* line; though the warrant was expressed, by mistake, to be for services in the continental line. The Court said, "It is not doubted that a patent appropriates the land. Any defects in the preliminary steps which are required by law, are cured by the patent. It is a title from its date, and has always been held conclusive against all, whose rights did not commence previous to its emanation."

In *Boardman et al.* v. *The Lessees of Reed et al.* 6 Pet. R. 342-7, (decided in 1832,) also cited by defendant's counsel upon this point, the Court instructed the jury that the

grant to the plaintiff, which was given in evidence, was a complete appropriation of the land therein described, and vested in the patentee the title; and that any defects, in the preliminary steps by which it was acquired, were cured by the grant.    Judge *McLean*, in delivering the opinion of the Court, said: "There can be no doubt of the correctness of this instruction.    This Court have repeatedly decided that at law, no facts behind the patent, can be investigated.    A court of law has concurrent jurisdiction with a court of equity in matters of fraud; but the defects in an entry or survey, cannot be taken advantage of at law.    The patent appropriates the land, and gives the legal title to the patentee.    The District Court said nothing more than this; and it was justified in giving the instruction, by the uniform decisions of this Court.

*Bagnell et al.* v. *Broderick*, 13 Pet. R. 455–6–7, (decided in 1839,) is then cited by defendant's counsel.    A dissenting opinion, delivered in the case by Justice *McLean*, seems to be more particularly relied upon; and it must be admitted that the argument of that able Judge, is a very strong one. The facts, too, present as strong a case for the defendants as could possibly be imagined.    And if the decision of that case, be received as evidence of what the law *is*, the question under discussion here, is put entirely at rest. *Broderick*, the plaintiff, claimed by virtue of a patent from the United States to one Robertson, dated June 17, 1820. *Byrne*, under whom the defendants claimed, proved a clear *equitable* title in himself, derived, too, from Robertson, long prior to the date of the plaintiff's patent.    Judge *McLean* says: "It appears that the patent was issued to John Robertson, Jr. improperly; as, in 1809, he conveyed all his interest in the land.    Before the emanation of the patent, he had not a shadow of title, either equitable or legal, to the land in dispute.    And the patent must have been fraudulently obtained by him on the presentation of

Bruckner's lessee *v.* Lawrence.

the certificate of location made by Byrne.   The evidence on this point is too clear to be controverted.   It is established by deeds executed in the most solemn form, and by records which contain the highest verity.   The inference of the fraud is as irresistible, as are the facts from which it is inferred.   The proof of Byrne's title is irrefragible.   And it is equally clear, that Robertson had no title to the land, until he fraudulently obtained the patent. Having no shadow of right, he could obtain the patent, in his own name, by no other than fraudulent means.   And no court which could feel itself authorised to look behind the patent, could hesitate to pronounce the title of Byrne valid against the patentee, who has sought to cover his fraud by this legal instrument."   This case arose in Missouri, and was one of the New Madrid claims, growing out of an act of congress passed in 1815 ; and it seems there is a statute of that state, declaring, in effect, that a court of law may do, in an action of ejectment, what it would be competent for a court of chancery to do.   Judge *McLean's* opinion is evidently based upon that statute ; for he says, again:  " Why may not a court of law protect the better right of Byrne?  The right may be investigated as fully, and considering the nature of the rights, under the Missouri statute, as safely in a court of law as in a court of chancery.   But this with the court is not a question of policy.   It is a rule of evidence and of property adopted by the state of Missouri, and our whole course of adjudications requires us to regard it.   There is, therefore, no more violation of principle in examining the title of Byrne at law, than in equity.   The result is substantially the same in both modes; as the title of Byrne must be protected from the fraud by which it has been attempted to be overreached and subverted."   And he adds:  "Judging from the evidence of this case, I have never seen a grosser act of fraud, than the obtainment of this patent

by Robertson; eleven years after he had conveyed every vestige of right in the land which was relinquished as the consideration to the United States for the location in controversy. It is a well settled principle, that fraud may be investigated as well at law as in chancery; and I am strongly inclined to think if this fraud had been brought before the court and jury, independent of the statute of Missouri, they must have determined that it vitiated the patent."

But all the Judges, except Justices *McLean* and *McKinley*, adhered to the decisions formerly made upon this question, and Justice *Catron*, who delivered the opinion of the majority of the court, cited the cases in Wheaton and Peters, which I have before referred to, adopting their argument and language. He said: "The patent to John Robertson, Jr. is deemed to have been issued regularly; and we must presume that all the usual incipient steps had been taken before the title was perfected. The patent merged the location certificate on which the survey was founded; so that no second survey could be made by virtue of the certificate." "Congress has the sole power to declare the dignity and effect of titles emanating from the United States; and the whole legislation of the federal government, in reference to the public lands, declares the patent, the superior and conclusive evidence of legal title; until its issuance, the fee is in the government, which by the patent passes to the grantee, and he is entitled to recover the possession in ejectment."

The counsel for the plaintiffs cited, for our consideration, upon the branch of the case now under consideration, many of the authorities already adverted to, and several additional ones, all bearing, with greater or less might upon the question. But we think it unnecessary to analise or comment upon them. *Stringer et al.* v. *Lessees of Young et al.* 3 Pet. R. 338, '40, '41 ; *Boardman et al.* v. *Reed*

Bruckner's lessee *v.* Lawrence.

*et al.* 6 Pet. R. 328, 342, 313 ; *United States* v. *Attedondo et al.* 6 Pet. R. 724, '5, '7, '8, '32 ; *Patterson* v. *Winn et al.* 5 Pet. R. 241 ; *Brown* v. *Jackson*, 7 Wheat. R 218 ; *Jackson* v. *Lawton*, 10 Johns. R. 23.

I will, however, advert for a moment to *Johnson* v. *Lawton*, 10 Johns. R. 23, that being a case in a state court. The plaintiff claimed under a patent dated October 28, 1811, and the defendant offered in evidence a patent to one Allen, (under whom he claimed,) dated March 5, 1812. The patent to Allen recited that the previous one to the plaintiff was issued through mistake.   Defendant also offered to prove by parol, that Allen was in possession of the lot in controversy, in August, 1803, and had paid the state treasurer $1,430.60, in full of principal and interest due for the lot.   The court rejected the defendant's patent and parol evidence, and the plaintiff had a verdict.   On a motion to set aside the verdict and for a new trial, the case was argued in the Supreme Court, and *Kent*, then Chief Justice, delivered the opinion, saying : " The patent granted to the plaintiff, being the elder patent, is the highest evidence of title.   As long as it remains in force, it is *conclusive* as against a junior patent for the same land.

If the lands passed by the first patent, the record is without operation and void.   It has been the uniform practice in our courts, in all questions of title, to look to the elder patent and give it effect.   Nor can the Court take notice of any equitable claim upon the General Government, which a third person might have had in respect to the lands in question, prior to the issuing of the patent.

Letters patent are matters of record, and the general rule is, that they can only be avoided in chancery, by a writ of *scire facias*, sued out, on the part of the Government, or by some individual prosecuting in its name. This is the settled *English* course, sanctioned by nume-

rous precedents; and we have no statute or precedent, establishing a different course here."

On the investigation which we have been able to make of this question, we are left without a single doubt.   We think the charge of the Circuit Court of Monroe county to the jury on this point, was clearly right.

4. The remaining enquiry is, whether a deed, executed while a third person is in the possession holding the premises adversely to the grantor, passes the title so as to enable the grantee to recover in ejectment, or whether it is inoperative and void.

The first question is, whether the doctrine of adverse possession obtains at *common law.*

If it be a part of the common law, not repugnant to the ordinance of 1787, or to the laws of Michigan in force on the 7th of May, 1835, and be applicable to our condition and circumstances, it was then of force here, and rendered the conveyance from Watson to the plaintiff inoperative and void as to that portion of the land claimed by the plaintiff, which the defendant held adversely to him.   That the selling pretended titles, as it is called, was in violation of the common law, before the enactment of the statute of 32d Hen. VIII. cannot be questioned.   *Partridge* v. *Strange et al.* Plowd. 88, expressly affirms the proposition.   Chief Justice *Montague,* who presided in the trial of that case, says: "It seems to me that a pretenced right or title is in but one case, and that is where *one* is in possession of lands or tenements, and *another* that is *out* of possession claims them, or sues for them; that is a *pretenced right or title.*   Further—"I take the statute, that if he who is out of possession bargains or sells, or makes any covenant or promise to part with the land after he shall have obtained possession of it—this shall be within the danger of the statute, whether he who so bargains sells, or promises, have a good and true right and title or

not; and in this point the statute has not altered the law, for the common law, before this statute, was, that he who was out of possession might not bargain, grant or let his right or title, and if he had done it, it should have been void." See also Co. Litt. 347. In New York, every grant of land, (except as a release,) is void as an act of maintenance, if, at the time, the lands are in the actual possession of another person claiming under a title adverse to that of the grantor. This principle has always been received as settled law in that state. Chancellor *Kent* says: "It was a principle conformable to the whole genius and policy of the common law, that the grantor in a conveyance of land, (unless in the case of a mere release to the party in possession,) should have in him, at the time, a right of possession." 4 Kent's Com. 446–7. *Blackstone* says the same doctrine prevails in the code of all well governed nations, for possession is an essential part of title and dominion over property. 2 Bl. Com. 311. Chancellor *Kent* says again: "It seems to be the general sense and usage of mankind, that the transfer of real property should not be valid, unless the grantor hath capacity as well as the intention to deliver possession." 4 Kent's Com. 448.

That the inhibition of the sales of pretended titles, constitutes a part of the common law, we think is incontrovertible. That it has been adopted and is regarded as such, by most of the states of this union is certain, and we can discover no reason why it should not be so regarded in this state. Article 2, of the Ordinance of 1787, before referred to, provides, among other things, that the inhabitants of said territory, (meaning the territory northwest of the river Ohio,) shall always be entitled to the benefit of judicial proceedings according to the course of the common law.

The instruction given to the jury, therefore, on this point, was in accordance with law. (1)

(1) In *Stockton et al.* v. *Williams et al.* decided by the Supreme Court in January Term, 1845, on appeal from the Court of Chancery, and which will hereafter be reported, the Court, stating that they were not disposed to review or disaffirm the decision in *Bruckner's lessee* v. *Lawrence;* still, refused, on the ground of that decision, to decree a deed *void,* which was executed by one Elizabeth Lyon, to Williams and Pritchette, two of the defendants, while the complainants held adverse possession of the premises conveyed, and to direct the execution of a *release* of the premises by W. and P. to the complainants, but held that "the deed as between them, (W. and P.) and their grantor and her heirs, would be good. It conveyed all the interest of the grantor to the grantees. The grantees could not enforce it in their own names, but might do so in the name of the grantor; and if a recovery of possession could be had in her name, Williams and Pritchette would be entitled to such possession; as she would be estopped from questioning the validity of her own deed." *Reporter.*