# STONEROAD *v.* STONEROAD.

158 240
L-ed 966
175 79

ERROR TO THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 11. Submitted November 9, 1893. — Decided May 20, 1895.

The act of Congress of June 21, 1860, c. 167, confirming the claim of Preston Beck, Jr., to a grant of land from Mexico made before the Treaty of Guadalupe Hidalgo, by necessary implication contemplated that the grant should be thereafter surveyed, and that such survey was essential for the purpose of definitely segregating the land confirmed from the public domain.

Such survey could only be made by the proper officer of the political department of the government; but notice thereof was not necessary.

Such survey having been made by such officer, and on the trial of this case evidence having been introduced tending to show that land of the defendant in controversy lay outside of the lines 'of that survey, but within the limits of the designated boundaries of the grant under which the plaintiff claimed, the defendant was entitled to have the jury instructed that if they found from the evidence that the grant had been properly surveyed by the United States, and that that survey had been approved, as the correct location of the grant, and that the land in dispute in the defendant's occupation and possession was outside the limits of the survey, they must find for the defendant, although they might believe that the land so in dispute was within the boundaries of the grant, as set forth in the original title papers thereof.

The right of the defendant in error to avail himself of the legal privilege of appeal from the survey to the Secretary of the Interior is not concluded by any expression of opinion by the court in this case.

In 1854 Congress passed "An act to establish the offices of Surveyor General of New Mexico, Kansas, and Nebraska, to grant donations to actual settlers therein, and for other purposes." Act of July 22, 1854, c. 103, 10 Stat. 308. Sections 8 and 9 of this law read as follows:

"SEC. 8. *And be it further enacted*, That it shall be the duty of the Surveyor General, under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico;

and, for this purpose, may issue notices, summon witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Gaudalupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States; and shall also make a report in regard to all pueblos existing in the territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land. Such report to be made according to the form which may be prescribed by the Secretary of the Interior; which report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm *bona fide* grants, and give full effect to the treaty of eighteen hundred and forty-eight between the United States and Mexico; and, until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provisions of this act.

"SEC. 9. *And be it further enacted,* That full power and authority are hereby given the Secretary of the Interior to issue all needful rules and regulations for fully carrying into effect the several provisions of this act."

Under these provisions Preston Beck, Jr., a citizen of the United States and a resident of the territory of New Mexico, presented his petition to the Surveyor General, on May 10, 1855, to be recognized as the legal owner, in fee, of a certain tract of land lying in the county of San Miguel, in that territory "known as the Hacienda de San Juan Bautista del Ojito del Rio de las Gallinas," and bounded "on the north by the landmarks of the sitio of Don Antonio Oritz and the mesa of the aguage de la Yegua, on the south by the river Pecos, on the east by the mesa of Pajarito, on the west by the point of the mesa of the Chupaines. . . . And the

said Preston Beck, the 'present claimant,' claims a perfect title to said land by virtue of a grant made on the twenty-third day of December, in the year one thousand eight hundred and twenty-three, by Bartolmé Baca, governor and superior political chief of the province of New Mexico, by and with the advice and approbation of the provincial deputation of the said province of New Mexico, to Juan Estevan Piño, a citizen of New Mexico, which said grant was made as aforesaid by authority of the laws, usages, and customs of the republic of Mexico in force at the time, and of the laws and regulations of Spain which were declared and recognized to be in force and effect at that time in the republic of Mexico. . . .

"The said Preston Beck claims and further states that he cannot show the quantity of land claimed by him except as set forth in said grant, as within the above-described well-known metes and boundaries nor can he furnish a plat of survey, as no survey has ever been executed.

"Claimant further states that one Alexander Hatch and about one hundred other persons have settled upon said grant without a title from any person or from any government and with a full knowledge of the existence of the claim now presented.

"Claimant further states that by virtue of said grant Juan Estevan Piño was lawfully put in possession of said tract of land by the competent authorities, and settled upon said claim with a large amount of property, and there held possession of the same for the space of twenty-one years and until expelled by the hostilities of the savage Indian tribes; that upon the death of Juan Estevan Piño the said tract of land was inherited by his two sons, Justo Piño and Manuel D. Piño, who were his only heirs, and the present claimant claims his title by virtue of deeds from Justo Piño and Gertrudes Roscom, his wife, and from Manuel D. Piño and Josefa Oritz, his wife, all of original grants and deeds of transfer and documentary titles, marked A, B, C, D, E, are herewith filed and made part of this claim.

"Claimant files this his said claim before you under the 8th,

section of the act of Congress approved 22 July, 1854, entitled ' An act to establish the offices of Surveyor General of New Mexico, Kansas, and Nebraska, to grant donations to actual settlers therein, and for other purposes,' and respectfully asks confirmation by you of his said claim."

The controversy initiated before the Surveyor General by the filing of this petition was decided by him in 1856. His opinion recites the claim, the grant made, the fact that the grantee was put in possession by the alcalde, the acquisition by Preston Beck, Jr., from the grantee or heirs, of all their rights, states that a hearing was had between Beck as owner of the grant and a large number of settlers, and continues :

" This case was argued very elaborately by the counsel on both sides, and many points concerning boundaries of the grant were introduced in the testimony, and the arguments, which this office deems unnecessary at present to notice, as they have no direct reference to the validity of the grant.

" This case has been considered by this office with much attention, and as it is understood that the validity of nearly all the private land claims in this Territory depends upon the same principles, all the authorities that could be procured having any bearing on the case have been carefully examined and maturely deliberated. The documents presented in this case are original, and the signatures of the granting officers and conveyors are proven by testimony to be genuine, and the chain of title from the original grantee to the present claimant is complete. . . .

" The boundaries set forth in the granting decree and natural points, well known to all the community, and in the absence of any survey, which was not required in the grant, are amply sufficient to designate such portion of land as was intended to be severed from the public domain. The evidence presented by the claimant shows that the grantee did have possession of the land granted to him; that he occupied it with his stock and cultivated certain portions of it, and he continued to do so until he was driven off by the hostile Indians. Not having voluntarily abandoned the land, he did therefore voluntarily forfeit his right to the grant.

[*It is evident from the context that the word* "not" *has been omitted before the word* "therefore" *in the last sentence.*]

" The intention of the provincial deputation and the recommendation of the governor and no conditions being attached to it makes the grant a positive and absolute one, and vests in the grantee a title in fee to all the land embraced within the boundaries set forth in the granting decree.

" The objections made by counsel against the validity of the grant are therefore overruled.

" Believing this to be one of the cases coming under the provisions of the treaty of Guadalupe Hidalgo of 1848, and having strong claims to validity under the decisions of the Supreme Court of the United States in similar cases, the grant made to Juan Estevan Piño to a certain tract of land in the county of San Miguel, and known as the Hacienda de San Juan Bautista del Ojito del Rio de las Gallinas, and of which Preston Beck, Junior, is the present claimant, is hereby approved, and the Congress of the United States is respectfully recommended to cause a patent to be issued to the said Preston Beck, Jr., by the proper department and cause the same to be surveyed."

On June 21, 1860, Congress passed an act, c. 167, of which the first section reads as follows:

" That the private land claims in the Territory of New Mexico, as recommended for confirmation by the Surveyor General of that Territory, and in his letter to the Commissioner of the General Land Office of the twelfth of January, eighteen hundred and fifty-eight, designated as numbers one, three, four, six, eight, nine, ten, twelve, fourteen, fifteen, sixteen, seventeen, and eighteen, and the claim of E. W. Eaton, not entered on the corrected list of numbers, but standing on the original docket and abstract returns of the Surveyor General as number sixteen, be, and they are hereby, confirmed: *Provided*, That the claim number nine, in the name of John Scolley and others, shall not be confirmed for more than five square leagues; and that the claim number seventeen, in the name of Cornelio Vigil and Ceran St. Vrain, shall not be confirmed for more than eleven square leagues to each of said claimants." 12 Stat. 71.

Preston Beck's claim was designated as "Number one" in the report of the Surveyor General, and was therefore embraced in this confirmatory act. After the passage of the above act, a survey of the grant in question was made by the officers of the government and approved by the Secretary of the Interior. A statement of facts signed by both parties admits that this survey was made "without notice to the owners of said grant, or either of them." It is also admitted that Preston Beck, Jr., in whose name the grant was confirmed, died in 1860, a short time before the passage of the confirmatory act, leaving his estate, in which the above grant was included, to his brother, cousin, nephews and nieces, all of whom were non-residents of the Territory of New Mexico. It is conceded by the same statement that at the time of the making and approval of the survey, three of the beneficiaries under the will of Preston Beck, Jr., were minor children and three others were married women; and that the plaintiff, George W. Stoneroad, was not one of the legatees under said will, but subsequently acquired a third undivided interest in the grant. And it is further admitted that none of the owners of the land have acquiesced in the survey since the same was made and approved.

In 1885, George W. Stoneroad, the person thus conceded to be the owner of one-third of the original grant, brought an action of ejectment against James P. Stoneroad, alleging that he was entitled to the possession of the Preston Beck grant, and that the defendant had illegally possessed himself of a portion thereof. The defendant pleaded not guilty. At the trial of the case the parties entered into the stipulation, in which the facts, as above stated, were admitted, and one clause of this stipulation, in addition, says, in reference to the act of Congress; "said confirmation being absolute and without any condition whatever, and to the extent of the boundaries given in the original muniments of the title, as the same are correctly copied in said Exhibit A" — the "Exhibit A" referred to being the original grant, describing the property as above mentioned. Besides the admissions which were thus made, oral evidence was introduced tending to show that the defend-

ant James P. Stoneroad possessed two tracts of land outside of the lines of the survey made by the government, but, as asserted, within the limits of the designated boundaries of the grant. At the trial the defendant asked the court to give the following instruction:

" The jury are instructed that if they find from the evidence in this case that the grant, in evidence in this case, has been surveyed by the proper authorities of the United States, and that such survey has been approved by the proper authorities of the United States as the correct location of said grant, and that the land in dispute in this case and in the occupation and possession of said defendant is outside the limits of survey, they must find for the defendant, though they may also believe that the said land so in dispute is within the boundaries of said grant, as such boundaries are set forth in the original title papers of said grant, and the recommendation of the Surveyor General relative there to is evidence in this cause."

This instruction was refused, and a verdict was rendered in favor of the plaintiff. The defendant, after an ineffectual attempt to obtain a new trial, took the case by writ of error to the Supreme Court of the Territory. There the judgment below was affirmed, and the defendant then brought the case here by error.

*Mr. Charles H. Gildersleeve* for plaintiff in error.

*Mr. John H. Knaebel* and *Mr. T. B. Catron* for defendant in error.

Mr. Justice White, after stating the case, delivered the opinion of the court.

The first and fundamental question is, did the act of Congress of 1860, which confirmed the claim of Preston Beck, Jr., as recommended by the Surveyor General, provide for, or by necessary intendment contemplate that a survey of the grant should be made in order to separate the land embraced within it from the public domain? And we are not relieved from

the consideration of this question by the admission made by the parties to the suit, that the confirmation was " absolute and without any condition whatever." This admission is in no way the concession of a fact, but is a declaration by the suitors of their opinion on a matter of law. Whether the act of Congress was absolute or conditional, whether it required, even though it absolutely confirmed the title, that a survey should be made to determine the extent of the property, depends upon the terms of the law. The report of the Surveyor General who passed upon the claim states among the reasons for his recommendation to Congress : " The boundaries set forth in the granting decree are natural points, well known to all the community, and in the absence of any survey, which was not required in the grant, are amply sufficient to designate such portions of land as were intended to be severed from the public domain."

In his recommendation to Congress, however, which is practically the decretal part of his opinion, he says : " The Congress of the United States is respectfully recommended to cause a patent to be issued to the said Preston Beck, Jr., by the proper department, and cause the same to be surveyed." It was this recommendation which was acted upon by Congress.

We think the confirmatory act of 1860, by necessary implication, contemplated that the confirmed grant should be thereafter surveyed, and that such survey was essential for the purpose of definitely segregating the land, to which the right was confirmed, from the public domain, and thus finally fixing the extent of the rights of the owners of the grant. To hold otherwise would be to conclude that Congress had confirmed the claim and yet deprived the claimant of all definite means of ascertaining the extent of his possessions under the confirmed title. In view of the fact that the Surveyor General's report showed the importance of the grant, and that it had never been surveyed, we think it must be considered that Congress intended that it should be surveyed in order that its boundary lines might be accurately fixed, before the issue of a patent. The grant was an unconfirmed Mexican grant, and, therefore, before it could take a definite and conclusive shape

so far as the United States was concerned, it required action and approval on the part of this government. As said by this court, in speaking of grants within this territory of New Mexico, in the case of *Astiazaran* v. *Santa Rita Mining Co.*, 148 U. S. 80, 81, "Undoubtedly, private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction, and were entitled to protection, whether the party had the full and absolute ownership of the land, or merely an equitable interest therein, which required some further act of the government to vest in him a perfect title. But the duty of providing the mode of securing these rights, and of fulfilling the obligations imposed upon the United States, by the treaties, belonged to the political department of the government ; and Congress might either itself discharge that duty, or delegate it to the judicial department. *De la Croix* v. *Chamberlain*, 12 Wheat. 599, 601, 602 ; *Chouteau* v. *Eckhart*, 2 How. 344, 374 ; *Tameling* v. *United States Freehold Co.*, 93 U. S. 644, 661 ; *Botiller* v. *Dominguez*, 130 U. S. 238."

Now, at the time of the passage of this confirmatory act, and for a long time prior thereto, the general laws of the United States confided to certain administrative officers the duty of surveying not only the public lands but also private land claims. Rev. Stat. §§ 441–453. The practice of the United States in dealing with the public domain and all governmental grants of land is to survey and issue a patent. For this purpose, in the proper administrative branch of the government, accurate and efficient machinery, accompanied with full remedial process for the correction of error, is provided. In speaking of the general policy of the law as to the surveying of the public domain, including private land grants, this court, through Mr. Justice Lamar, in *Knight* v. *United States Land Association*, 142 U. S. 161, 177, said :

"That section provides as follows : ' The Secretary of the Interior is charged with the supervision of public business relating to the following subjects : . . . Second. The public lands, including mines.' Section 453 provides : ' The Commissioner of the General Land Office shall perform, *under the*

*direction of the Secretary of the Interior*, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents for all agents [*grants*] of land under the authority of the government.' Section 2478 provides : 'The Commissioner of the General Land Office, *under the direction of the Secretary of the Interior*, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of this title [The Public Lands] not otherwise specially provided for.'

"The phrase, 'under the direction of the Secretary of the Interior,' as used in these sections of the statutes, is not meaningless, but was intended as an expression in general terms of the power of the Secretary to supervise and control the extensive operations of the land department of which he is the head. It means that, in the important matters relating to the sale and disposition of the public domain, the surveying of private land claims, and the issuing of patents thereon, and the administration of the trusts devolving upon the government, by reason of the laws of Congress or under treaty stipulations, respecting the public domain, the Secretary of the Interior is the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States. As was said by the Secretary of the Interior on the application for the recall and cancellation of the patent in this pueblo case (5 Land Dec. 494) : 'The statutes in placing the whole business of the Department under the supervision of the Secretary, invest him with authority to review, reverse, amend, annul, or affirm all proceedings in the Department having for their ultimate object to secure the alienation of any portion of the public lands, or the adjustment of private claims to lands, with a just regard to the rights of the public and of private parties. Such supervision may be exercised by direct orders or by review on appeals. The mode in which the supervision shall be exercised in the absence of statutory direction may be prescribed by such rules and regulations as the Secretary may adopt.' "

It is not to be presumed that Congress intended, by confirming a grant which had never been surveyed, and had, therefore, never been distinctly separated from the public domain, to exempt it from the survey essential to its accurate segregation and delimitation, especially when this survey was fully provided for by the general law, in accordance with the uniform public policy of the government in dealing with questions of this character. The general rule being to exact a survey, the grant here under consideration could only be exempted from this requirement by an express statement in the act of Congress indicating an intention to depart from the rule in the particular instance. No such intention is anywhere expressed in the confirmatory act. Indeed, the idea that the act, whilst confirming the title, did not contemplate a survey, for the purpose of marking its limits, amounts to the contention that the public domain itself should remain in part forever unsurveyed and undetermined, since a separation of the private claim from the public domain was essential to the ascertainment of what remained of the latter. Construing, then, the confirmatory act, in connection with the general law of the United States, the recommendations of the Surveyor General upon which the confirmation was made and the essential requirements of the case as presented to Congress, we conclude that a survey of the grant was contemplated by the confirmatory act, and we will determine the rights of the parties in accordance with this conclusion.

It is unquestioned that shortly after the confirmation of the grant a survey was made, and that the land in possession of the defendant below is outside of its lines. The plaintiff's case, therefore, necessarily rests upon a disregard of the official survey. In order to sustain his position two legal propositions are advanced: first, that the holders of the grant are not bound by the survey, for the reason that it was made without notice to them, and because at the time of the survey some of them were minors and some were under coverture; and, second, that the survey did not conform to the boundaries of the grant, and, therefore, should be judicially corrected. Both these propositions are untenable. The first attacks the survey

as a whole, upon the theory that notice was an essential prerequisite, and that coverture and minority were obstacles to the right of the government to survey the claim as confirmed, for the purpose of ascertaining the extent of the grant and in order to separate it from the public domain.  It is unnecessary to point out the fallacy which underlies this proposition, because, even if its correctness be conceded, the concession would be fatal to the plaintiff's case.  As we have seen, a survey was necessary.  Now, if the survey was illegal, and is to be treated as not existing, then we are without the guidance provided by law for the purpose of ascertaining whether the land claimed from the defendant was within or without the area of the grant.  In other words, if it be conceded that there is no survey, the plaintiff is without right to relief, since a survey was essential to carry out the confirmatory act.  The second proposition is equally unsound.  It presupposes the existence in the courts of the United States of a power to survey the public domain, and thus discharge a function confided by law to an administrative branch of the government. In *West* v. *Cochran*, 17 How. 403, 414, this court, speaking through Mr. Justice Catron, said :

"It has often been held by this court that the judicial tribunals, in the ordinary administration of justice, had no jurisdiction or power to deal with these incipient claims, either as to fixing boundaries by survey, or for any other purpose; but that claimants were compelled to rely upon Congress, on which power was conferred by the Constitution to dispose of and make all needful rules and regulations respecting the territory and property of the United States.  Among these needful regulations was that of providing that these unlocated claims should be surveyed by lawful authority ; a consideration that has occupied a prominent place in the legislation of Congress from an early day."

Considering the same subject in *Knight* v. *U. S. Land Association, supra,* speaking through Mr. Justice Lamar, the court said, p. 176:

"It is a well-settled rule of law that the power to make and correct surveys of the public lands belongs exclusively

to the political department of the government, and that the action of that department, within the scope of its authority, is unassailable in the courts except by a direct proceeding. *Cragin* v. *Powell*, 128 U. S. 691, 699, and cases cited. Under this rule it must be held that the action of the Land Department in determining that the Von Leicht survey correctly delineated the boundaries of the pueblo grant, as established by the confirmatory decree, is binding in this court, if the department had jurisdiction and power to order that survey."

These views are particularly applicable to the case in hand, since the act providing for the office of the Surveyor General for New Mexico authorizes him to examine and report, under such rules and regulations as the Secretary of the Interior may adopt, and requires that his report shall be transmitted to Congress for its action. Even if the general rule were otherwise, these provisions necessarily preclude judicial cognizance of the subject-matter, and confine it to the supervision of the political and administrative departments of the government. And the terms of the act become especially cogent when considered in connection with antecedent legislation under similar circumstances. They differ materially from the language of the measures previously adopted by Congress for confirming the outstanding titles in Louisiana, Florida, and California. In those cases the statutes, while creating administrative officers for the purpose of ascertaining and passing on the grants, expressly gave a right to the parties to invoke the aid of the courts in order that the correctness of the actions of the officers named might be judicially determined. It was under such provisions that many of the cases referred to and relied on by the defendant in error were decided. The absence of a provision in the present statute for a judicial review of the Surveyor General's action indicates the intention of Congress to reserve to itself the right to pass upon such claims. *Astiazaran* v. *Santa Rita Mining Co.*, *supra*. Hence the many authorities cited by the defendant in error have no application. Thus *United States* v. *Arredondo*, 6 Pet. 691; *Mitchell* v. *United States*, 9 Pet. 711, and *Fremont* v. *United States*, 17 How. 542, were the results of

an express provision giving parties an ultimate recourse to the courts. *Langdeau* v. *Hanes*, 21 Wall. 521, involved no assertion of a power in the courts to destroy a survey duly made; there the survey had been made, and was not assailed. The finding of the court below in that case, which was here affirmed, was as follows: "1st. That the act of confirmation of 1807 was a present grant, becoming so far operative and complete, to convey the legal title when the land was located and surveyed by the United States in 1820, as that an action of ejectment could be maintained on the same." In *Whitney* v. *Morrow*, 112 U. S. 693, there had been an unquestioned segregation of the property after the confirmation by the commissioners under a special act of Congress, by long-continued actual possession.

Nothing in the record indicates that the defendant in error has availed himself of the legal privilege of appeal to the Secretary of the Interior, and of course his right to so do is not concluded by any expression of opinion which we have made. Our conclusion is, that the instruction requested by the defendant was wrongfully refused in the lower court, and the judgment of the Supreme Court of the Territory of New Mexico, which upheld the action of the court below, was erroneous. It is, therefore, ordered that the judgment be

*Reversed.*