Campbell, Chief Justice,
delivered the opinion of the court:
This suit is brought under the Indian depredation act of 1891 (26 Stat. L., 851), which is entitled “An act to provide for the adjudication and payment of claims arising from Indian depredations.” Speaking of this act, Nott, Ch. J., in the Welch case, 32 C. Cls., 109, says: “ It affords a remedy *341 for already existing claims, but neither defines them nor creates new liabilities against Indians.” To the same effect are Jaegar case, 38 C. Cls., 214-217; Merchant case, 35 ib., 403-405; McCoy case, 38 ib., 163; Sayt case, 38 ib., 455; Thomison case, 35 ib., 395.
By these and other cases which might be cited it is established that the rights and liabilities of the parties are to be determined in accordance with enactments prior to said act, which in this class of cases are the Indian trade and intercourse act 30th June, 1834 (4 Stat. L., 729), as modified by the act of 28th February, 1859 (11 Stat. L., 401), and the joint resolution 25th June, 1860 (12 Stat. L., 120).
Two classes of cases are provided for: (1) Those involving wrongs by Indians outside of their reservations; (2) those involving wrongs within the reservations where the injured party was lawfully in Indian country (Merchant case, 35 C. Cls., 403; see also Andrews case, 179 U. S., 96). As expressed by Chief Justice Nott in the Welch case, 32 C. Cls., 109:
“ But the statute assured indemnity to white men only in these two classes of cases, viz, where the Indians were intruders in the white man’s country and where the white man was lawfully within the Indians’ country.”
And this construction follows the language of section 17 of the said act of June 30,1834, which provides:
“That if any Indian or Indians, belonging to any tribe in amity with the United States, shall, within the Indian country, take or destroy the property of any person lawfully within such country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States and there take, steal, or destroy any horse, horses, or other property belonging to any citizen or inhabitant of the United States,” redress may be had as provided in said act, “ and in the meantime, in respect to the property so taken, stolen, or destroyed, the United States guarantee to the party so injured an eventual indemnification.” It is also provided that “if any nation or tribe to which such [offending] Indian may belong receive an annuity from the United States, such claim shall at the next payment of the annuity be deducted therefrom and paid to the party injured, and if no annuity is payable to such nation or tribe then the amount of the claim shall be paid from the Treasury of the United States.”
*342 The act thus defilies a right which it creates, and by the said act of 1891 a fornm is provided for its enforcement. In the cases cited it is pointed out that the Indian depredation act imposes the jurisdictional condition that a depredation for which the Government can in any event be made to respond must have been committed “without just cause or provocation on the part of the owner ” of the property taken or destroyed, and that this condition does “ not operate retrospectively upon the rights of the claimant or the liabilities of the defendants.” Weldh case, 32 C. Cls., 109.
It is manifest therefore that to be entitled to recover the claimant must bring his case within one of the two categories provided for in the statute. Was claimant “within the Indian country,” and was he “lawfully within such country ? ”
The contention in this case is principally directed to the answer to these questions. The scene of the alleged depredation was in Arizona, a part of the country which was not included in the general designation of “Indian country” defined in the first section of the act of June 30, 1834, and this court had occasion to consider the question in Haytfs case, 38 C. Cls., 455, as to whether the territory acquired by the United States from Mexico under the treaty of Guadalupe Hidalgo was under the acts above mentioned Indian country. In a carefully considered opinion by Howry, J., it was held that the territory ceded by Mexico to the United States was not “ Indian country ” until set apart as a reservation for Indians. Speaking of the rights of the Utahs, which was the tribe defendants in the Hayt case, it was said: “It became Indian country when the United States set apart a reservation and not until then and to the extent of the reservations assigned to them only” (p. 464). An Indian reservation may be created and set apart by treaty, act of Congress, or Executive order. Gibson v. Anderson, 131 Fed., 39; Grisar v. McDowell, 6 Wall., 363-381.
The White Mountain ^Reservation was first selected as an Indian reserve under instruction of the Secretary of the Interior and was set apart as an Indian reservation by Executive orders dated November 9, 1871, and December 14, 1872. In the Executive order of the latter date an addi *343 tional tract of country, to be thereafter known as the “ San Carlos Division of the White Mountain Indian Reservation,” was added to the “ White Mountain Indian Reservation” in the Territory of Arizona, so as to “make the entire boundary of the White Mountain Reserve as follows, Kappler, Ind. Affairs, vol. 1 Laws, 2d ed., p. 813, viz:
“ Starting at the point of intersection of the boundary between New Mexico and Arizona with the south edge of the Black Mesa, and following the southern edge of the Black Mesa to a point due north of Sombrero or Plumoso Butte; thence due south to said Sombrero or Plumoso Butte; thence in the direction of the Piache Colorado to the crest of the Apache Mountains, following said crest down the Salt River to Pinal Creek to the top of the Pinal Mountains ; thence due south to a point 15 miles south of the Gila River; thence east with a line parallel with and 15 miles south of the Gila River to the boundary of New Mexico; thence north along said boundary line to its intersection, with the south edge of the Black Mesa, the place of beginning.”
As was said by the Supreme Court, “ It may be observed that the White Mountain Indian Reservation was a legally constituted Indian reservation.” In re Wilson, 140 U. S., 575.
’ The contention in this case involves the northern boundary of the reservation, and the claimant insists that his ranch and the property he had fenced were north of the reserva-, tion. It is conceded that his location at the date of the depredation alleged was several miles south of the northern boundary as surveyed by the Government in 1888. As will be noted from the boundaries given in the Executive order of December 14, 1872, the northern boundary is described as “starting at the point of intersection of the boundary between New Mexico and Arizona with the south edge of the Black Mesa and following the southern edge of the Black Mesa to a point due north of Sombrero or Plumoso Butte.” A mesa is defined to be a tableland or plateau with an abrupt or steeply sloping side or sides often bordering a valley; a high terrace, Webster's Dictionary; Encyclopedia Britannica, and they are said to be common in the southwestern United States.
Stoneroad v. Stoneroad, 158 U. S., 240, involved the question of a claim under a Mexican land grant, describing *344 tbe lands in New Mexico as bounded “ on the north by the landmarks of the sitio of Don Antonio Oritz and the mesa of the aguage de la Yegua, on the south by the river Pecos, on the east by the mesa of Pajarito, on the west by the point of the mesa of the Chupaines.” The following language is quoted by the Supreme Court from the report of the surveyor general of New Mexico who passed upon the claim: “ The boundaries set forth in the granting decree are natural points, well known to all the community, and in the absence of any survey, which was not required in the grant, are amply sufficient to designate such portions of land as were intended to be severed from the public domain.” We make this quotation because of its description of a mesa such as was the north boundary of the Indian reservation in question, and we shall also have occasion to refer to the principal question decided in said case.
That the “ Black Mesa ” was a well-defined natural boundary seems manifest from the facts that its southern edge, where it intersected the line between New Mexico and Arizona, was chosen for a starting point, that being the northeast corner of the reservation, and the northwest corner, many miles distant, was to be a point on the southern edge of the same Black Mesa due north of Sombrero or Plumoso Butte, a well-known point considerably to the south; that in April, 1876, an Executive order was issued restoring to the public domain a large area of the “White Mountain Indian Reservation ” lying west of a line which started at “ the northwest corner of the present reserve, a point at the southern edge of the Black Mesa due north of Sombrero or Plumoso Butte, thence due south,” etc. (thus again recognizing the definiteness of the southern edge of the Black Mesa at the northwest corner of the reservation; and again, when the northeast corner was changed from its point of original location to a point in longitude 109° 30' W. by Executive order of July 21, 1874, we must assume that the south edge of the Black Mesa was there also for a starting point.
No authoritative survey of this northern boundary appears to have been made until 1888, which followed the south edge of the Black Mesa as nearly as practicable from a point in *345 longitude-109° 30' W. to a point due north of Sombrero or Plumoso Butte. The northeast corner was located in longitude 109° 30' W. instead of on the line between New Mexico and Arizona because of the Executive order of July 21, 1874, restoring to the public domain “that portion of the White Mountain Reservation in Arizona Territory lying east of 109 degrees 30 minutes west longitude,” and we must assume that said corner was located on the south edge of the Black Mesa at that point.
The General Land Office caused said survey of the north line of the White Mountain Indian Reservation to be made in 1888, which was accepted by the Commissioner of the General Land Office February 6, 1889. This survey, it appears, was executed in compliance with a request from the Commissioner of Indian Affairs, who advised the Secretary of the Interior of the desirability of the survey, and who had recommended in 1882 that the War Department be asked to detail an engineer officer to run the northern boundary line of the reservation. Lieut. Bingham, Corps of Engineers, United States Army, executed a survey of a portion of the northern boundary in 1883 and completed it in 1884, and these two surveys were substantially identical, following the south edge of the Black Mesa as nearly as practicable from a point in longitude 109° 30' W. to a point due north of Sombrero or Plumoso Butte.
There does not appear anything of record in the General Land Office or the Indian Office which would indicate an earlier survey of the north boundary than that executed by Lieut. Bingham in 1883 and 1884, and substantially followed, as above stated, in 1888. All Land Office maps published since 1889 shows the boundary according to said survey.
The claimant’s ranch was at Miners Camp, a place 10 or more miles south of the northern boundary line of the reservation (and therefore within the reservation), according to the said survey of 1888, as well as that of Lieut. Bingham, made in 1883-84.
From what has been said it would seem that the Black Mesa may have afforded a natural or permanent object and boundary, distinguishable from other objects and as is generally recognized courses and distances in a survey yield to *346 known visible and definite objects. Shipp v. Miller, 2 Wheat., 316. However, a survey was actually executed and accepted by the Commissioner of the Land Office. Except in the particulars noted above, there was no Executive order issued after the establishment of the White Mountain Indian Eeservation which increased or diminished or affected its northern boundary.
By section 2115, Eev. Stat., it is provided that—
“ Whenever it becomes necessary to survey any Indian or other reservations or any lands the same shall be surveyed under the direction and control of the General Land Office,” — •
which acts under the direction of the Secretary of the Interior.
In the said case of Stoneroad v. Stoneroad, 158 U. S., 240, a survey had been recommended by the surveyor general and was made prior to the issuance of a patent under the direction and control of the General Land Office. The plaintiff there insisted upon two propositions, the first of which it is unnecessary to advert to here, and contended, “second, that the survey did not conform to the boundaries of the grant and therefore should be judicially corrected.” Both propositions were held to be untenable, and referring to the one just quoted the court said: “ The second proposition is equally unsound. It presupposes the existence in the courts of the United States of a power to survey the public domain, and thus discharge a function confided by law to an administrative branch of the Government,” and quoted approvingly from Knight v. Land Association, 142 U. S., 161, as follows: “ It is a well-settled rule of law that the power to make correct surveys of the public lands belongs exclusively to the political department of the Government, and that the action of that department, within the scope of its authority, is unassailable in the courts except by a direct proceeding. Cragin v. Powell, 128 U. S., 691.”
When, therefore, we find a boundary fixéd by Executive order, as in this case, subsequently surveyed by the direction of and accepted by the legally constituted authority for that purpose, we might very well rest the decision of the ques *347 tion upon th.e authority of said cases, because if the survey were wrong we could not, in a proceeding such as is before us, correct it. But claimant’s counsel insists that there was another line “ established ” as the north boundary of the said reservation, which was about 3 miles south of Miners Camp, and that, therefore, claimant was not, in 1881, within the reservation or “ Indian country.” With commendable industry he has produced maps and tracings to show that the line was “ established ” as he contends, and several witnesses depose as to where the line was. We can not assent to the argument that “there was no fixed north boundary of the White Mountain Indian Reservation under the Executive order” if, as we have attempted to show, the Black Mesa was sufficiently distinct and known to be ascertained by a person using reasonable diligence and ordinarily acquainted with conditions in that section of the country. Counsel admits that there were certain natural monuments, which he says are “ referred to in a general way, descriptive of where the north boundary might be located whenever the same might be officially surveyed,” but we think the natural monuments were descriptive of where the boundary was, and unless the commissioner or his surveyor could change the effect of the Executive order, it would seem to be obligatory upon them to survey the line mentioned in the Executive order, and that was done.
The maps referred to indicate by dotted lines the general area designated on the map as the White Mountain Reservation, but these lines are apparently mere projections indicative of where the lines, in the absence of surveys or other accurate information, were supposed to be, and the maps under the facts of this case are entitled to little, if any, evidential value. They do not agree with each other, and while we do not hold that official maps coming from the proper source and adopted or promulgated by the lawful authorities may not be used in evidence when material and relevant, we do hold that maps such as we have in this case can not be accepted to fix a line variant from one definitely ascertained by survey duly accepted by the General Land Office. When the lines are lawfully located by survey, *348 the maps purporting to be made in conformity therewith by the lawful authorities may in some cases show where the lines are located with reference to other things on the map, but where the lines have not been surveyed the maps must yield to an actual survey when lawfully executed and accepted.
The contention that the lines “were established” falls short of the legal requirement. In Andrews' case, 179 U. S., 96, the Court of Claims found, as a fact, that claimant was proceeding along “ an established trail ” when the depredation occurred, and the Supreme Court held that the finding, to sustain the court’s judgment in favor of the claimant, should be construed as a lawfully established trail, because being upon a legally established trail was necessary to justify the claimant in being in Indian country. So in the case before us a map or other evidence must refer to a legally established line and not to be a supposititious or projected line, which, however honestly believed to show the boundary, can not have the probative force required when, as a fact, it is found that the lawful survey places the correct line several miles away from the place indicated by the projected lines on the maps or by the oral proof. As to the latter it is sufficient to say that, being hearsay and not showing its source, we regard it as too unreliable to be given weight in this case if it were permissible to contradict by parol the official survey, and we may add in reference to the maps referred to that it nowhere appears that claimant, before locating at Miners Camp, ever consulted any map or other data as to the boundary of the reservation. He does testify that he inquired of two Army officers at Fort Apache early in 1880, and was informed by them of the location of the north boundary. In this class of cases the court has not been disposed to accept the uncorroborated testimony of a claimant upon a material question as sufficient proof of the fact, but aside from that the Thomison case, 35 C. Cls., 899, settles that issue, in principle at least, when it ruled that “in the circumstances of this case the Indian agent could not license persons to settle within any part of the Indian country.” This statement is applicable to the action of said officers if they showed claimant the supposed line.
*349 Argument is also made for claimant that the alleged action of the departments in having defined the boundaries by maps as claimed is conclusive upon the Indians, and that they may not “ deny or dispute the rightfulness of the location of such boundaries so as to escape the result of their unlawful act under the defense that the claimant was at the time of the depredation unlawfully within their reservation.” But this argument would lead to a misconception of the character of this suit. The United States is here a defendant, by virtue of a statute which, as already stated, defines a right which it creates, and the suit can not be maintained except it come within the meaning of that statute. The liability which the Government assumes is one of “ guaranty,” and the conditions upon which the guaranty can be invoked are either that the Indians in amity invaded white man’s country or that the white man was lawfully within Indian country. In a sense it is true that wherever the depredation was committeed it was a wrong, and in that sense the Indians who committeed it might not be heard to say it was right, but we are dealing with legal wrongs, which the statute defines so far as any liability of the Government is concerned, and there is no element of estoppel as against the Indians which can aid the claimant in this suit. Nor is the question, properly speaking, whether claimant was unlawfully on the reservation, but it is, in the language of the statute, whether he was “ lawfully within Indian country.” Lawfully usually means in pursuance of or according to law, or that which is not contrary to law. The statutes provide heavy penalties against settling in “ Indian country,” and authorize the summary ejection of settlers or trespassers upon Indian land. It appears that persons located upon said reservation north of where the claimant had built his ranch were required to move after said survey was made and accepted. Their mistake as to the boundary, if an honest mistake, can not give them a right of action under said statute. As the statutes forbade the claimant settling within the Indian reservation, it is manifest that he settled where he did at his own risk. If he was outside of the reservation, a legal wrong was done him, for which he is entitled to indemnity, and if he was within the reser *350 vation, it is an essential element of bis case that be sbow be was “lawfully” there. Tbe Thomison case is not contrary to these views, and it is cited for claimant as coming “nearest to tbe questions involved herein.” In that case it appeared that tbe Osages depredated upon, lands belonging to the Cherokee Strip, in which they had no right or title by treaty or otherwise, or, as stated by the court in that case, “ but here it appears that the Osage depredators were also intruders upon the same land on which plaintiff had wrongfully located himself. Plaintiff was there by mistake and the Osages were there in violation of their treaty obligations,” and it was held that the plaintiff was not, within the meaning of the act and as to the Osages, within Indian country. It was stated, however, that the “ question is not entirely free from doubt, and we think plaintiff is entitled to the benefit of this doubt,” inasmuch as defendants could appeal and plaintiff could not. The facts of that case are not applicable here, because the Indians who committed the depredation were upon their own reservation, and claimant was not lawfully there, nor are we satisfied that a survey was necessary to ascertain the north boundary of this reservation, though one was necessary to deliminate the Cherokee Strip. We find that claimant was at the time of the depredation within the Indian reservation and that he has not shown that he was lawfully there.
His petition will accordingly be dismissed, and it is so ordered.