PEOPLE v. WARNER.

1. SWAMP LANDS—GRANT OF 1850—ISLANDS IN GREAT LAKES.

   A marshy island in one of the Great Lakes, not in existence at the time of the swamp-land grant by Congress to the State in 1850, belongs to the State, by virtue of its ownership of the soil beneath the waters of the Lakes.

2. SAME—CERTIFICATION BY SECRETARY OF INTERIOR—EFFECT OF OMISSION OF LANDS.

   A marshy island in one of the Great Lakes, existing as unsurveyed land at the time of the certification by the secretary of the interior of the list of swamp lands covered by the grant, will not, because of its being omitted from such list, be deemed to have been determined by the secretary not to be within the grant, unless there is evidence tending to show that the question as to such land was actually considered and passed upon.

3. SAME — CHARACTER OF GRANT — SUSPENSION OF RIGHT OF ENTRY.

   The swamp-land grant was a grant in præsenti, conveying to the State the title to such lands as came within its terms, but suspending the right of entry until the lands covered thereby should either be determined by the secretary of the interior, or he should refuse to act.

4. SAME—ADJUDICATION.

   Where the secretary of the interior refuses to make the determination as to particular unsurveyed lands claimed by the State under the terms of the grant, the State may cause a survey to be made, and have the matter adjudicated in the courts.

5. SAME—ADVERSE POSSESSION AS AGAINST STATE.

   Possession of such lands under claim of title would not be adverse to the State until its right of entry became complete under the terms of the grant.

6. SAME—RECLAMATION.

   The swamp-land grant of 1850 covered all swamp and overflowed lands, and not those alone which were susceptible of profitable reclamation by drains and levees.

7. RIPARIAN RIGHTS — GREAT LAKES — LIMIT OF PRIVATE OWNERSHIP.

   The limit of private ownership of islands in the Great Lakes is

the water line, regardless of the fact that adjacent land is submerged only to a slight depth, and is grown up to aquatic plants

8. Same—Accretions—Submerged Island.

Additions to the land of a littoral proprietor by the action of the water become a part of the land, and belong to the owner, where they are so gradual as to be imperceptible; but if an island arises out of the water, and afterwards becomes connected to the land of the littoral proprietor, it belongs to the State.

9. Same—Access to Navigable Water.

The owner of an island in one of the Great Lakes has no such right of access to navigable water as will support a claim of title in fee, as against the State, to an intervening island.

Error to Huron; Beach, J. Submitted January 28, 1898. Decided March 15, 1898.

Ejectment by the people against Hulbert H. Warner and John D. Weeks. From a judgment for plaintiff on verdict directed by the court, defendants bring error. Reversed.

*Cyrenius P. Black* (*John G. Milburn*, of counsel), for appellants.

*Fred A. Maynard*, Attorney General (*Avery Bros. & Walsh*, of counsel), for appellee.

Hooker, J. In 1853 there existed in Saginaw Bay an island called "Maisou," which had never been surveyed. In that year a survey of this island was made by the government, and it was sold in 1868. A copy of the plat which was made by the surveyor is attached to this opinion,[1] whereby it is shown that the surveyor found land lying to the eastward of Maisou island, which he denominated "Wet Marsh," and apparently did not survey. It appears upon the plat as two small islands. These islands now constitute a part of a somewhat extensive stretch of land and shallows, known as the "Middle

[1] Page 230.

Ground," shown by a map filed herewith,[1] and which is claimed by the State, but occupied by the defendant Warner, who is the admitted owner of Maisou island.

By Act No. 66, Pub. Acts 1891, the Middle Ground is made a public hunting and shooting ground. An effort was made by the State, in 1885, to induce the authorities at Washington to survey this Middle Ground, and issue a patent to the State, under the swamp-land act of 1850; and a survey of some sort was made by a federal surveyor, named Strudwick. The defendant Warner intervened, and made claim to the Middle Ground as an accretion to Maisou island; and, upon the other hand, the State claimed title to the newly-found land as accretions

---

[1] See opposite page.

to the two islands mentioned as "Wet Marsh." The commissioner of the general land office determined that the Middle Ground was an accretion to Maisou island. The matter was finally disposed of by Vilas, secretary of the interior, by a decision reported in 7 Land Dec. Dep. Int. 255 ( *The Middle Grounds*). This decision reversed that of the commissioner. We infer from the decision that the survey was completed in 1887 by Strudwick, and was duly filed; that it included the " swamp and overflowed grounds called the 'Wet Marsh,' and other land then apparently lying between them and Maisou island, * * * now known as the 'Middle Grounds.'" The controversy appears to have related to the territory between Maisou and the original Wet Marsh; Warner claiming it as an accretion to Maisou, and the State claiming it as an accretion to the Wet Marsh. To determine this, it became necessary to locate the Wet Marsh as it was in 1850, and investigate the nature, condition, and extent of the alleged accretion. This the secretary refused to do, upon the ground that the department was "not equipped with the proper means of ascertaining these facts." He therefore directed the discontinuance of the proceedings *under the surveys*, and that the parties be left to the maintenance of their rights in the courts. The State thereupon proceeded to make a survey, and, after its completion, brought ejectment against Warner and his tenant, who have appealed from a directed verdict in favor of the State. Their first contention is that the State has not proved its own title.

If the land which was denominated "Wet Marsh" in the plat of 1853 was in existence in 1850, it was included in the grant to the State, provided it was of the character described. If it was not then in existence, it became the property of the State by virtue of its ownership of the submerged land at the bottom of the lake. *People* v. *Silberwood*, 110 Mich. 103. Assuming its existence in 1850, and that it comprised only such land as the act sought to convey, it then became the duty of the secretary of the

interior to so determine, and list it as such. The defend-
ants maintain that it was determined not to be swamp land
within the act, inasmuch as the interior department made
and filed a list embracing lands within the township of
which both surveys show that this is a part, which list did
not include these islands. Failing in this contention, it is
said that there has never been a determination that any of
these lands were covered by the act. We will pass the
first contention with the remark that if the inference is
warrantable that particular lands in a township are not
covered by the act, because not included in the list or
patent of lands made by the interior department in
furtherance of the law, it should not apply to lands which,
though within the township, have never been surveyed,
unless there is evidence tending to show that the question
as to such lands was actually considered and passed upon.
It is evident that these lands were not considered when the
list was made. What evidence there is indicates that the
department considered these islands the property of the
State, when they were brought to the attention of the
secretary. The case of *Chandler* v, *Mining Co.*, 149 U.
S. 79, applied to a claim to lands which had been surveyed
previous to the time that the list was made. This might
reasonably justify the presumption of exclusion. The
decision of the secretary of the interior referred to would
indicate that it was his understanding that unsurveyed land
is not treated as excluded because not in certified lists of
the township. Until the islands were surveyed, it could
not be told whether or not they would be within the town-
ship, which until that time had not been extended to them.
No list of lands or patent has been made of territory in
this locality since 1853. On the contrary, when it was
demanded, it was refused, not because the department
could not determine that these islands were the property
of the State, but because it had not the means, or (as the
secretary held) the power, to determine where they were
located. In other words, while he conceded the right of
the State, he was unable to determine what portion of the

land for which the State asked a patent constituted these islands, and could not know that some part of the land asked for was not an accretion to Maisou island, and therefore no part of or accretion to the property granted to the State.

We cannot accede to the contention that the government has made no survey of this Middle Ground. There is not only the original survey, the plat at least of which shows the Wet Marsh, but there is the Strudwick survey, whatever it was, upon which the commissioner determined the Middle Ground to be an accretion to Maisou, and the secretary determined that it was at least a doubtful question. There is significance in his statement that—

"The plat of the government survey also shows that at some considerable distance, a mile and a half to two miles, to the northeast, two small marshy islets of land appeared, of such inconsiderable size and so wet that no distinct plat of them as parts of any section was made, but the surveyors simply marked them as 'Wet Marsh.' Necessarily, therefore, if this survey was any indication of the fact, these small plots of wet marsh passed to the State under the swamp-land act of September 28, 1850. That act was a present grant, and vested the title to all the swamp and overflowed lands of this character within the limits of the State in the State upon its passage. Whether or not a tract of land passed to the State by virtue of that grant depends simply upon the question, What was the character of the land at the time, as being swamp or overflowed? A special agreement has been made with Michigan (1 Lester's Land Laws, 542), as with some other States, whereby the field notes of the government survey are to be conclusively taken as the basis of determination of swamp and overflowed land in that State, and of adjustment under the grant.   *   *   *   This recital of the facts shows that all of the title of the United States to the swamp and overflowed lands mentioned, being such as were shown by the plat and field notes of the survey, passed to the State in 1850, and that all the title of the United States to Maisou island passed to the patentee in 1868." *The Middle Grounds,* 7 Land Dec. Dep. Int. 256.

May we not reasonably understand that this land was all surveyed, and that the secretary was satisfied, and has

determined by this decision, that the Wet Marsh passed to the State in 1850? And does it not follow, as the secretary practically says, that all of this Middle Ground, whether wet or dry, high or low, that has appeared above the water since, must belong to the State, unless it may be lawfully considered an accretion to Maisou? What element is it that is lacking in the State title? Simply an inability to designate the particular legal subdivisions that cover the original "Wet Marsh." Apparently, that can never be done authoritatively by a survey. The only evidence by which it may now be established is the recollection and testimony of men.

If the secretary is correct in his opinion that his department cannot determine this question, it is manifest that only the courts can. If wrong, it is plain that he has refused to do so. In such case the courts may, as to each parcel, after it is brought within a legal subdivision by survey. Two cases are cited by counsel for the State as authorizing an inquiry by a court in an action brought to recover the land. The first of these is *Railroad Co.* v. *Smith*, 9 Wall. 95. This case sustained the admission of oral proof of the character of the land, offered by the defendant in possession under a patent from the State, which purported to convey the premises as swamp land, to establish the proposition that they were not within a subsequent grant to a railroad, from which the plaintiff derived its claim of title, because within the exception in the later grant, which excluded lands conveyed under the swamp-land act. This was upon the theory that the swamp-land act constituted a grant of land *in præsenti*, passing the title to the lands,—a proposition which is sustained by numerous State and Federal cases. This was not a unanimous opinion, and has since been discussed in several cases, where prominence has been given to the fact that this evidence was admitted, not to establish a title, but to show that the particular land could not be considered within the railroad grant. Stress was also laid upon the fact that the secretary of the interior had

neglected or refused to do his duty, and, as the courts had no power to compel performance, the State would be remediless, and might lose an entire grant through the contumacy or neglect of an officer, if the courts could not settle the question. In this case there was a federal survey. In the later case of *Wright* v. *Roseberry*, 121 U. S. 488, Mr. Justice Field had occasion to review this question, in a case where the plaintiff, who was a patentee of the State of swamp lands, undertook to recover possession from an occupant claiming title under a patent from the United States issued after 1850. The land had never been surveyed by the general government, nor had the lists mentioned been made or filed, nor had a patent issued to the State. We will not attempt a lengthy discussion of this case. It reviews the former cases, and contains the following significant language:

"The result of these decisions is that the grant of 1850 is one *in præsenti*, passing the title to the lands as of its date, but requiring identification of the lands to render the title perfect; that the action of the secretary in identifying them is conclusive against collateral attack, as the judgment of a special tribunal to which the determination of the matter is intrusted; but, when that officer has neglected or failed to make the identification, it is competent for the grantees of the State, to prevent their rights from being defeated, to identify the lands in any other appropriate mode which will effect that object. A resort to such mode of identification would also seem to be permissible where the secretary declares his inability to certify the lands to the State for any cause other than a consideration of their character."

We understand the effect of this decision to be that where the secretary of the interior has neglected to perform his duty under the act, by identifying the land, a person who claims under the State may prove his title in a collateral action by showing, by any evidence that will prove it, that the premises in dispute were necessarily included in the grant, according to its terms. It is true that the decision in that case might have been planted solely upon subsequent legislation, wherein Congress authorized

another mode of identification, but it was not. We understand it to enunciate the doctrine that, when the means provided by the act for adjudicating the question of what particular lands are actually within the terms of the original grant fail, the State or its grantee may identify the land conveyed by the usual methods of identification, and by proving that it is within the description of the deed. And if counsel are correct in saying that it is admitted that the government never made a survey of this territory, and therefore that we cannot find that the secretary has determined that these islands were " swamp or overflowed lands," and that they became the property of the State, then we should merely say that these facts also were not determined, and are yet open questions, and may be determined by a survey by the State and adjudication by the courts. From the cases cited, we understand that the swamp-land act was a grant *in præsenti;* that it conveyed the title, but suspended the right of entry until it should be determined by the statutory tribunal what subdivisions of land it applied to, or it should refuse or fail to do so. When this tribunal failed and refused to act, the suspension was at an end, and the State or its assignee was at liberty to identify and take possession or bring an action to recover the land, upon the theory that the grant was certain because it could be made certain, as in any other case.

Here, then, we have, at the worst, a case where two islands are known to have belonged to the State, or may be shown to be within the grant. Through natural causes, it has become impossible for them to be definitely located with reference to any legal subdivision, or, if that is possible, the tribunal erected to determine the question has no jurisdiction, or has refused to act in the premises, and convey the land by patent to the State. We think it is competent for the State to survey the premises, and to prove the facts regarding the nature of the land, and thus establish title in the State. Practically, however, it is of little importance in the case to know in what particular

legal subdivision those original wet marshes should be located. Wherever they were, so long as within the territory described, it is sufficient if they were all swamp. It is the other and additional land that gives rise to the actual dispute. But for this, there could be no claim that the premises were an accretion to Maisou, and it only becomes important to know where the wet islands were situated when it becomes necessary to find that some of this land was an accretion to them; and this only becomes necessary in case there is a possibility of its being an accretion to Maisou, because upon this defendant Warner's title depends, and, if the land is not his, it must, under the evidence, belong to the State, if the two islands were swamp lands.

It is urged that the islets were not swamp or overflowed lands, within the act, because they could not be profitably reclaimed. We think the act should not be construed to grant only such parcels as were specifically and individually susceptible of profitable reclamation by drains and levees. All swamp lands were granted, that the State might thereby acquire a fund for general drainage purposes. The act applies to islands as well as the main land, and, if we cannot say that the evidence indisputably shows that the islets were swamp and overflowed lands, we must, at the least, say that was a question for the jury.

Being convinced that the State has proved a *prima facie* title to, at least, a portion of the premises, we will discuss the case from the standpoint of the defendants. There are four subjects to which our attention is directed:

1. Whether the evidence conclusively shows that no part of the Middle Ground is an accretion to Maisou.

2. Whether, under the law, the defendant Warner's title extends eastward from Maisou to the deep water beyond the Middle Ground.

3. Whether, as owner of Maisou, he has any riparian rights which justify a reversal of the case.

4. Adverse possession.

The most comprehensive claim of title on the part of the defendant Warner is that his purchase of Maisou

island gave him title of all land and water to the center of the main channel between the Middle Ground and the east shore of the bay. This would include the Wet Marsh and all of the Middle Ground. We have already intimated that the rule by which such a result is reached does not apply to the Great Lakes. The title to the fee in the submerged land belongs to the State. *People* v. *Silberwood*, 110 Mich. 103.

The depth of water upon submerged land is not important in determining the ownership. If the absence of tides upon the Lakes, or their trifling effect if they can be said to exist, practically makes high and low water mark identical for the purpose of determining boundaries (a point we do not pass upon), the limit of private ownership is thereby marked. The adjoining proprietor's fee stops there, and there that of the State begins, whether the water be deep or shallow, and although it be grown up to aquatic plants, and although it be unfit for navigation. The right of navigation is not the only interest that the public, as contradistinguished from the State, has in these waters. It has also the right to pursue and take fish and wild fowl, which abound in such places; and the act cited has attempted to extend this right over the lands belonging to the State adjoining that portion of the water known to be adapted to their sustenance and increase.

Upon the subject of accretions, we understand the law to be that additions to the land of a littoral proprietor by the action of the water, which are so gradual as to be imperceptible, become a part of the land, and belong to the owner of the land, but, when not so, they belong to the State. So, if, by the imperceptible accumulation of soil upon the shore of an island belonging to a grantee of the government, or by reliction, it should be enlarged, such person, and not the State, would be the owner; but if an island should first arise out of the water, and afterwards become connected to that of the private proprietor, it would not thereby become the property of such person, but would belong to the State. See 1 Am. & Eng. Enc.

Law (2d Ed.) 467, *et seq.*, and cases cited. It will be seen by the map that the point at which Maisou island and the Middle Ground approach each other nearest is on the S. W. ¼ of section 8. If the Middle Ground or any part of it is an accretion to Maisou island, it is by reason of the growth of the former from this point; and it becomes important to know whether the land was washed up against Maisou, and gradually extended that point eastward and northward, or whether land arose from the water to the northward and eastward, and gradually approached Maisou, until a gradually-narrowing water passage was obliterated at times of low water. In the former case there may be force in the claim that there was an accretion to Maisou, and it would then become important to know how far it extended. We are of the opinion that this was a question for the jury, and should not have been taken from them. We have here, therefore, a question of fact as to whether any, and, if so, what, portion of the Middle Ground is an accretion to Maisou. As to such extent the defendants would be entitled to a verdict.

It is contended that the defendant Warner, as littoral proprietor, has a right of access to navigable water to the eastward of Maisou. If this is true (which we do not intimate), it is merely a right to use the intervening land for the purpose, which does not interfere with the rights of the public, and does not support a right to take full possession, and exclude both the State and the public from a large area of land and water, under a claim of title in fee. There is nothing in the case to indicate that any such access has ever been sought, or that it is likely to be. It is not clear that, with the exception of a very small portion, the entire shore of Maisou is not accessible to vessels ; and it is obvious that this is not a meritorious defense in an action brought to determine the ownership of land, where each party claims an absolute title in fee simple.

It remains to allude to the question of adverse posses-

sion.   The claim is made, and some evidence appears in support of it, that the defendant Warner and his grantors have enjoyed the exclusive possession, under claim of title, of the whole or some portion of the land in controversy from the year 1870.   This possession, such as it was, does not appear to have been unquestioned.   As early as 1885, we ·find the State claiming it, and from that time to this it has steadily attempted to acquire possession ; and, as appears, the right of entry to the two islets and their accretions did not accrue until the failure of the secretary of the interior to list and convey the land.

We think the court erred in taking the case from the jury.   The judgment is reversed, and a new trial ordered.

The other Justices concurred.