BROWN v. MILLIMAN.

1. BOUNDARIES—SURVEYS—GOVERNMENT GRANT—ACCRETIONS.
   Complainants sought to restrain defendants from trespassing upon certain marsh lands in Lake Erie which they claimed under government grant. Defendants contended that the portion of the land upon which the alleged trespass was committed was an island which had formed subsequent to the government survey, and did not pass with the grant to complainants. From the government survey and field-notes, it appeared that, if the shore line had remained substantially unchanged, a creek located in the field-notes was one that continued to exist; otherwise, that the present creek did not then exist, and the one described in the notes was not accounted for. Allowing courses and distances as indicated in the field-notes to be controlled by the creek, the shore line of the land claimed by complainants corresponded with the line of the survey. The witnesses were agreed that there had been no change in the shore line within their recollection. *Held*, that the land was included in complainants' grant.

2. SAME—COURSES AND DISTANCES—FIXED OBJECT CONTROLLING.
   A call for a natural and ascertained object in a government survey, as a creek, a spring, or a river, will control courses and distances.

Appeal from Monroe; Kinne, J. Submitted January 3, 1899. Decided April 4, 1899.

Bill by Harvey H. Brown and others against William Milliman, Jr., and Samuel Gay, to quiet title to land. From a decree for complainants, defendants appeal. Affirmed.

*E. T. Wood* (*Willis G. Clarke*, of counsel), for complainants.

*E. R. Gilday* and *Willis Baldwin*, for defendants.

MOORE, J. Complainants obtained a decree in the court

below quieting their title to a piece of land, and restraining defendants from trespassing thereon.    The defendants have appealed from that decree.

A reference to the accompanying plats will aid in understanding the questions at issue.    The first plat is one prepared by the United States land department from a survey

TOWNSHIP Nº V  RANGE Nº X  EAST OF THE MER (MICHIGA?
SURVEYED BY JOSEPH FLETCHER 1817.

made in 1817.    The other plat was made by Mr. Allen, who was employed by defendants, from a survey made by him in February, 1897.    The land in dispute is marked upon Mr. Allen's plat as "Gay's Island."

The complainants are hunters.    For the purpose of

having permanent grounds for the abode of ducks and
other game, they have acquired by purchase or lease lands
extending for a mile north of the mouth of Huron river,
and for about four miles south or southwest of its mouth,
bordering on Lake Erie, about 2,600 acres in all.   It is

their claim that their ownership of the shore of the lake is
interrupted only by a piece of land known as the "Clark
Piece," which extends about a mile on the shore.   The
complainants have title in fee to the southeast quarter of
section 25, and claim to be owners of all the land east of
the center line of section 25.   It is the claim of the
defendants that a piece of land called by them "Gay's
Island" has formed east of section 25 since the govern-
ment made its survey, and that the title thereto is not in

the complainants, but is in the State. They claim one
Thompson was in possession of this land as a squatter,
and, obtaining a quitclaim deed from him in January,
1897, they brought a small house, which was upon run-
ners, over the ice, and put it upon this land. They per-
sonally, or by some one else, have retained possession of
the house, and claim to be in possession of the land they
call "Gay's Island," and that the legal title thereto is in
the State of Michigan. They sought to get a title to this
land from the United States government, and also from
the State of Michigan. The officials of the respective land
departments did not understand their respective offices
showed any title which could be conveyed. It is the
claim of defendants the case is within *People* v. *Warner*,
116 Mich. 228, and *Sherwood* v. *Commissioner of State
Land Office*, 113 Mich. 227.

These lands are mostly marsh lands, usually covered
with a small depth of water, upon which rushes, wild rice,
and other aquatic growths thrive. At the mouth of the
Huron river, and extending south therefrom, the action of
the waves upon the sand has thrown up a sand dune, and
the sand, mixed with the wreck of the marsh, has lifted
that portion of the land higher out of the water than the
portions of the marsh westerly therefrom. West of this
land is Vermette creek, which puts into the Huron river a
short distance above its mouth. This marsh extends back
from the sand dune or higher land bordering the lake a
mile or more, and at certain times shooting punts can be
pushed all through it. It is the claim of defendants that
near the south border of the land occupied by them there
is a cut running from Vermette creek through to Lake
Erie, which makes of their land an island, and that this is
made land, and that, as it is east of section 25, it is not
the land of complainants. It is the claim of complainants
that there is no water going through this cut except at
high water, when it is simply one of the outlets of the
Huron river, and that the meandered line made by the

119 MICH.—39.

vernment survey on the east side of section 25 is practically the east line of the land in controversy. They also claim they and their grantors have been in possession of these lands for a good many years, and that Thompson was in possession under a license from them, and that his possession was their possession, and that he had nothing he could convey to defendants. There is no claim by any one that Thompson had any record title. The circuit judge found he had no title to the premises, that complainants and their grantors had been in possession thereof for more than 20 years, and that complainants were owners in fee of the title.

This land was surveyed by the surveyors of the United States government in 1817, and plats therefrom made and field-notes prepared. Some of the witnesses have known the land from 30 to 60 years, and they all agree that there has been no considerable change in the Huron river or the shore line. The defendants caused a survey to be made of these lands by Mr. Allen in February, 1897. According to the government survey and field-notes, the southeast corner of section 25 was at the western shore of Lake Erie. The meander line, according to the field-notes, from the post at the southeast corner of section 25, was as follows:

"N., 41 W., 9.50, S. bank of Huron river. Impossible to take the dist. across by observation on account of the grass and rushes being very high. No object could be seen. Set post. Thence up and on the south bank of Huron river with the several courses thereof. N., 70 W., 15.50, small creek .50 wide, course N.; N., 40 W., 27.50; N., 12 W., 17.00; N., 38 W., 11.00; N., 67 W., 17.50; N., 32 W., 6.00; N., 5 E., 12.50; N., 32 W., 3.08; N., 22 W., 2.23. Intersected post Cor. Sec. 24—25."

Treating the southeast corner post as being at the shore line, the above courses and distances are approximately the same as the present shore line. Vermette creek is accounted for as being in the same position in relation to the shore line fixed in the field-notes as it is in fact.

Mr. Allen, in his survey, treated the post at the south-

east corner of section 25 as being 17.20 chains west of the shore line, and then ran his meander line according to the field-notes. He did not find the creek called for by the field-notes, nor any creek at all. He did nothing to ascertain the accuracy of the stake he found at the southeast corner of section 25. He was told that it was put there by a former surveyer, Mr. Bartlett. He testified that the variation of the compass now is nearly one-half degree west. On the government plat it was said to be 4.39 degrees east. This variation of nearly 5 degrees would make a difference of 14 chains in 2 miles. Mr. Allen also testified he had found variations in these ancient government surveys of 7 or 8 rods across a single section. The survey, as made by Mr. Allen, left Vermette creek east of the meander line, and, if his construction is to prevail, it did not in fact exist at the time the government survey was made. This is a result which is entirely untenable. We think it very clear that substantially all the lands in controversy were embraced within the line as meandered by the government surveyor, and were in section 25 as surveyed by him and as platted by the government. This has been the construction put upon the situation by the officers of the United States land department and the land department of the State.

In *County of St. Clair* v. *Lovingston*, 23 Wall. 46, Justice Swayne said:

"It is a universal rule that course and distance yield to natural and ascertained objects. A call for a natural object—as a river, a spring, or even a marked line—will control both course and distance."

Practically the same language is used by Justice CHAMPLIN in *Turner* v. *Holland*, 65 Mich. 453.

In *Gilman* v. *Riopelle*, 18 Mich. 164, Justice COOLEY said:

"Where definite and permanent boundaries are given, the deed must be held to convey all the land within those boundaries, notwithstanding the quantity is much greater than that mentioned. This is on the familiar principle

that the incorrect portion of the description is to be rejected where that which remains is sufficient, and that definite and permanent monuments are to control distance and quantity."

See *Bruckner's Lessee* v. *Lawrence*, 1 Doug. 29, and cases there cited; *Morrow* v. *Whitney*, 95 U. S. 551; *Forsyth* v. *Smale*, 7 Biss. 201.

In *Cragin* v. *Powell*, 128 U. S. 691, it is held that when the general land office has once made and approved a government survey of public lands, and the plats, maps, field-notes, and certificates have been filed in the proper office, and the lands are granted according to an official plat of their survey, the plat, with its notes, lines, descriptions, and land-marks, becomes as much a part of the grant, and, so far as limits are concerned, controls as much, as if such descriptive features were written in the deed or grant. In *Russell* v. *Maxwell Land-Grant Co.*, 158 U. S. 253, it is held a survey made by the proper officers of the United States, and confirmed by the land department, is not open to challenge by any collateral attack in the courts. In *Diehl* v. *Zanger*, 39 Mich. 605, Justice COOLEY said:

"Nothing is better understood than that few of our early plats will stand the test of a careful and accurate survey without disclosing errors. This is as true of the government surveys as of any others, and, if all the lines were now subject to correction on new surveys, the confusion of lines and titles that would follow would cause consternation in many communities. Indeed, the mischiefs that must follow would be simply incalculable, and the visitation of the surveyor might well be set down as a great public calamity."

See *Flynn* v. *Glenny*, 51 Mich. 580; *Beaubien* v. *Kellogg*, 69 Mich. 333; *Carpenter* v. *Monks*, 81 Mich. 103.

Applying these principles of law to this case, we think it entirely clear the court below was right in holding the complainants were owners in fee of these lands, and that

defendants were trespassers.   This makes it unnecessary
to discuss the other questions argued by the solicitors.

The decree is affirmed, with costs.

GRANT, C. J., MONTGOMERY and LONG, JJ., concurred.
HOOKER, J., did not sit.