E. P. BARRINGER, Appellee, v. HENRY E. DAVIS and wife,
Appellants.

**Public lands:** GRANT IN AID OF RAILROADS: UNSURVEYED LANDS: EF-
FECT OF RESURVEY.  Where an entire government section bor-
dering upon a lake has been granted to the State to aid in the
construction of a railroad, and upon compliance by the railway
company with the terms of the grant a patent has issued con-
veying the section to the State, the government no longer has
any legal or equitable title therein; and if by mistake some
small part of the subdivision was left unsurveyed its subse-
quent survey by direction of the Interior Department will not
effect a restoration of the same to the public domain, but any
apparent title thereto either in the government or State is
held in trust for the benefit of the railway company and its
grantees.  Where, however, the meander line, which is not ordi-
narily a boundary, is established so far from the shore line
as to indicate gross error or fraud and the government has
done nothing to part with its title to the unsurveyed land, it
may cause a resurvey of the same and dispose of it as govern-
ment land.  In the instant case the unsurveyed land is held to
be part of the original grant.

**Boundaries:** MEANDERED LAKES: EXCESS LAND: TITLE: ESTOPPEL. Where
the original government survey coincides with the shore of a
lake and terminates at meander posts on the lake shore, which
is marked as the boundary, the shore and not the meander line
constitutes the boundary; and a conveyance with reference
to such survey by the patentee of the government subdivision,
to which it had held the title for a long series of years with-
out questioning the survey, carries the title to the shore of the
lake, and the title to the land beyond the meander line can
not thereafter be questioned, in the absence of any showing
of an intention to reserve the same, or of knowledge of the
discrepancy between the survey and the actual acreage, or that
the grantor was misled as to the true situation.

**Same:** RESURVEY OF PATENTED LAND: JURISDICTION.  Where the gov-
ernment has parted with its title to lands and a controversy
arises between persons asserting conflicting claims under grants
or patents based upon an official survey, such survey is con-
clusive though grossly incorrect, and the land department has

no jurisdiction to affect the rights of the parties by a resurvey and issuance of a new patent.

**Conveyances:** REFERENCE TO PLATS: EFFECT. Where lands are conveyed according to the official plat of a survey thereof, the plat and all its notes, lines, descriptions and land marks become a part of the conveyance the same as though such descriptive features were written out therein, and are controlling so far as the limits of the tract are concerned.

**Conveyances:** DESCRIPTION: NATURAL OBJECTS: COURSE AND DISTANCE. Where the description in a deed refers to natural objects, as a lake shore, or even a marked line, they will control both course and distance and carry all the land within their boundaries though much greater in quantity than that mentioned.

McClain, J., dissenting.

*Appeal from Clay District Court.*—HON. A. D. BAILIE, Judge.

SATURDAY, FEBRUARY 20, 1909.

ACTION in equity to quiet plaintiff's title to land. The defendants deny plaintiff's claim of title, and by cross-bill ask that the same be quieted in themselves. Decree for plaintiff, and defendants appeal.—*Reversed* on rehearing.

*Buck & Kirkpatrick* and *Glass, McConlogue & Witmer,* for appellants.

*E. B. Evans,* for appellee.

WEAVER, J.—The land in controversy is a part of section twenty-seven, township ninety-seven, range thirty-five, in Clay County, Iowa. The original government survey of this section was completed about the year 1857, and by act of Congress, approved May 12, 1864, it was included in a grant of land to aid in the construction of a railroad crossing the northern portion of this State. The company which first undertook the construction of this

road and to secure the benefit of the grant was known as the McGregor & Western Railroad Company whose rights were subsequently acquired by the Chicago, Milwaukee & St. Paul Railway Company. The original survey developed the fact that the eastern portion of that section was covered or bordered by a permanent body of water known in the record as Trumbull Lake, and for the purposes of measurement of the land area a meander line was established on that side. According to the report as disclosed by the records the section was surveyed and mapped as indicated by the following plat which for convenience of reference we designate,

PLAT A.

These records show that, following the usual method,

the southwest corner of the section was first established, and that from this point the south line, being the line between sections twenty-seven and thirty-four, was run eastward forty chains for the quarter post, and at fifty-eight chains and twenty links it intersected the lake, where a post was set for the meander course. Returning to the southwest corner the western line was then established, and from the northwestern corner of the section the north line, being the line between sections 27 and 22, was run forty chains for the quarter post, and at fifty-nine chains and sixty links it intersected with the lake, where another meander post was set. The meander line was then run from the post at the southeast intersection with the lake as above indicated in a northerly direction, changing the course somewhat at three intermediate points, and closing upon the meander post at the northeast intersection with the lake as represented upon Plat A. As thus surveyed, the north half of the section, with which alone we are at present concerned, was subdivided into the northwest quarter containing one hundred and sixty acres; lot one containing thirty-nine and ten one-hundredths acres, and lot two containing forty-one and fifty-four one-hundredths acres, making an aggregate in the half section of two hundred and forty and sixty-four one-hundredths acres. It will be noted that Plat A of the original survey shows no meander line as distinguished from the shore line of the lake, and lots one and two are there described and platted as covering all of the land up to the lake shore. The necessary inference from the survey and plat is that the meander line thus established coincided with the shore line, or so nearly so that they were mapped as one.

The railway having been constructed, the State of Iowa which received the grant for that purpose issued its patent to the Chicago, Milwaukee & St. Paul Railway Company for said lands with others, under date of April 26, 1880, describing the tracts as shown by the original

survey. Soon after the issuance of patent to the north-
west quarter, and lots one and two of section twenty-seven,
they passed by proper conveyance from the railway com-
pany to the Iowa and Dakota Land Company, which in
1886 entered into a written contract to convey said de-
scribed lands to James Valley. At or soon after the date
of this contract, Valley entered into possession of the
property, making use of it as a farm, and on February
16, 1895, obtained a deed of conveyance therefor pursuant
to the terms of his said contract of purchase. On Decem-
ber 5, 1895, Valley conveyed to J. W. O'Neil, who some
months later conveyed the same to John Steen, by whom
on February 23, 1899, it was conveyed to Ellen Valley,
wife of James Valley. Valley and wife appear to have
been divorced about this time, and the latter quitclaimed
her title to the former on February 24, 1900. A year
later James Valley conveyed to James E. Moore, who
on August 7, 1901, conveyed to Henry E. Davis,
who is the principal defendant herein. In each of these
conveyances, the land is described by subdivisions as
indicated by the original survey, to wit, the northwest
quarter and lots one and two in section twenty-seven.
In most of them no mention is made of the number
of acres, but in the deed from the railway company
to the land company the description is stated as con-
taining two hundred and eighty and seventy-four one-
hundredths. In the deed from James Valley to James
E. Moore it is stated to contain three hundred and twenty-
one acres, while in the above-mentioned deed from Moore
to Davis the area is said to be two hundred and forty
acres. A year after the date of the last-named deed Moore
executed a second deed to Davis, purporting to be to the
land lying between lots one and two and Trumbull Lake,
and reciting that such conveyance may already have been
effected by the deed of August 7, 1901. It is the claim
of the defendant that the title thus derived vested in him

and his grantors, under the railway grant, a good and indefeasible title to all the lands in the north half of section twenty-seven not covered by the lake, including such land, if any, be the same more or less, as lies between the meander line and the shore of the lake. He also alleges that on obtaining the contract of purchase as aforesaid in 1886, his grantor, James Valley, took possession of all of said land to the lake shore under color of title and claim of right, and that from said date down to the commencement of this action the said Valley and his successive grantors have continued in open, notorious and adverse possession of said premises, and that by reason thereof the title now held by said defendant and derived as aforesaid is invulnerable.

The plaintiff asserts title to so much of the north half of section twenty-seven as lies between the lake shore and the meander line established by the original survey, and traces his claim as follows: In the year 1900 one J. C. Chapman and Myron Valley, a son of James Valley, petitioned the commissioner of the General Land Office at Washington, representing that by means of mistakes in the original survey in the location of meander lines about the shores of different alleged lakes in that vicinity a large area of arable lands had been left unsurveyed, and asked that an order for its survey be made, to the end that such lands might be opened to settlement and improved like other portions of the public domain. Upon this application M. P. McCoy was appointed engineer to make a report and survey of the tract or tracts thus designated. Pursuant to this authority the engineer proceeded to make a survey of more or less extensive tracts in eleven different sections in townships ninety-six and ninety-seven. A report of this survey was made in the year 1901, and some time thereafter the report was approved by the department at Washington. The manner in which this latter

survey affects the lands in section twenty-seven is shown by the following. plat:

PLAT B.

SEC.27 - TWP.97 - R.35, EX. I.

It will be observed that as traced by this survey the original meander line does not close upon the lake shore at the south end, but is located at a point some distance west therefrom, thus leaving between said line and the lake a body of land, a portion of which, lying within the north half of the section and marked lot five, containing forty-four and fifty-four one-hundredths acres, is the subject of the dispute now under consideration. McCoy's report, so far as it affects this particular tract, is, in substance, that running east from the southwest corner of that section a distance of fifty-eight chains and twenty links for the meander post as indicated by the original survey said line fell short of intersection with the lake, and had

to be extended twelve chains and fifty links further to reach the shore. As we understand his notes the southwest corner of the section and the quarter post on the south side as established by the original survey were discovered and recognized, but no artificial monument of the original meander corner appears to have been found. The engineer marked the point reached at fifty-eight chains and twenty links east from the southwest corner for the old meander corner, and at a point twelve chains and fifty links easterly therefrom established and marked a new corner. After the approval of the later survey a patent was issued to said lot five to the State of Iowa for the use of the Chicago, Milwaukee & St. Paul Railway Company, to which the State thereafter issued its patent. In 1902 the railway company quitclaimed its interest in the land to plaintiff. Upon the trial of the issues joined upon these conflicting claims of title the district court found for the plaintiff, and the defendants appeal.

The foregoing statement makes it clear that the appellee stands in the shoes of the railway company, and can not successfully assert any claim or title to the land which would not be available to said company had it never quitclaimed to him. The land grant of May 12, 1864, and subsequent patent to the State of Iowa in trust for the purposes of said grant had the effect to vest in the railway company the equitable title to section twenty-seven, not merely the marked subdivisions thereof, but to the entire section, or at least to so much thereof as had not already been otherwise appropriated; such title vesting not later than the date when the road was completed. The land grant having been made to the State, and the railway company having constructed the road according to the terms of the grant, the United States no longer had title, legal or equitable, to any part of said section, and if by any mistake any part of it had been left unsurveyed, its subsequent survey under

1. PUBLIC LANDS: grant in aid of railways: unsurveyed land: effect of resurvey.

an order from the Interior Department would not have
the effect to restore such land, or any part of it, to the
public domain.    Upon the fulfillment by the company of
the provisions of the grant it became entitled to receive a
patent therefor from the trustee, and said title, when re-
ceived, related back to the date of the grant.    *Grinnell v.
R. R. Co.,* 103 U. S. 739 (26 L. Ed. 456); *Schulenberg
v. Harriman,* 88 U. S. 44 (22 L. Ed. 551); *Wisconsin
R. R. v. Price,* 133 U. S. 509 (10 Sup. Ct. 341, 33 L.
Ed. 687); *Deseret Salt Co. v. Tarpey,* 142 U. S. 241
(12 Sup. Ct. 158, 35 L. Ed. 999).

The fact, if it be a fact, that the original patent de-
scribed the section by its subdivisions only can make no
difference, so long as the other conceded fact exists that
the grant included the entire section, and that the benefit
of said grant had been fully earned by said railway com-
pany.    The title thus acquired could be successfully asserted
by said company, and by its grantors against the world,
and if any apparent title was left, either in the United
States or in the State of Iowa, it was held upon trust, and
subject to the right of the company to demand and receive
the patent perfecting in itself the record of the title which
it had fully earned.    There can be no doubt that the orig-
inal patent was issued by the State and received by the rail-
road company, with the understanding that it covered all
of the north half of section twenty-seven.

The plat of the survey showed lots one and two extend-
ing to the water's edge.    The minutes of the survey lo-
cated both the southeast and the northeast meander corners
on the margin of the lake.    The meander line is not es-
tablished as a boundary, but a line drawn from point to
point along the shore, disregarding its minor sinuosities,
and is used, not to mark the limits of the tract of land
adjacent thereto, but simply as a basis from which to meas-
ure such tract and determine the number of acres for which
the government will demand payment; and, when payment

for such acreage is made, the title of the purchaser extends
to the water's edge, even though in places there be small un-
measured tracts lying outside of the meander line. *St.
Paul & Pac. R. R. Co. v. Schurmeir,* 74 U. S. 272 (19
L. Ed. 74); *Hardin v. Jordan,* 140 U. S. 380 (11 Sup.
Ct. 808, 838, 35 L. Ed. 428); *Ex parte Davidson* (C. C.)
57 Fed. 883; *Schlosser v. Cruickshank,* 96 Iowa, 418;
*Ladd v. Osborne,* 79 Iowa, 95; *Everson v. Waseca,* 44
Minn. 247 (46 N. W. 405); *St. Paul Railway Co. v. Rail-
road Co.,* 26 Minn. 31 (49 N. W. 304); *Heald v. Yu-
misko,* 7 N. D. 422 (75 N. W. 806). This rule is sub-
ject to the exception that if by a mistake or fraud in the
survey a meander line be run where no lake or stream call-
ing for such expedient exists, or if it be established at such
excessive distance from the actual shore as to leave between
its course and the shore an excess of unsurveyed land so
great as to clearly and palpably indicate fraud or mistake
in the survey, then the courts will, for equitable reasons,
treat the meander line as a boundary. *Mitchell v. Smale,*
140 U. S. 406 (11 Sup. Ct. 819, 840, 35 L. Ed. 442);
*Grant v. Hemphill,* 92 Iowa, 218. And where such mis-
take has occurred, and the United States has not in any
way parted with its right to the land so left unsurveyed,
the proper department of the government may cause the
survey to be made, and dispose of such tracts as portions
of the public domain. But where the United States has
parted with its title, a new survey can have no effect upon
the rights of those holding under prior grants or patents.
*St. Paul Railway Co. v. Schurmeier,* 74 U. S. 289 (19
L. Ed. 74); *Kirwan v. Murphy,* 109 Fed. 355 (48 C. C.
A. 399); *St. Paul Railway Co. v. R. R. Co.,* 26 Minn.
31 (49 N. W. 303); *Hardin v. Jordan,* 140 U. S. 400
(11 Sup. Ct. 808, 838, 35 L. Ed. 428); *Mitchell v. Smale,*
140 U. S. 406 (11 Sup. Ct. 819, 840, 35 L. Ed. 442);
*Moore v. Robbins,* 96 U. S. 530 (24 L. Ed. 848); *Kean
v. Roby,* 145 Ind. 228 (42 N. E. 1011).

It follows that when the railway company has fulfilled the conditions of the grant, its right to all of that portion of the public domain within the limits of section twenty-seven became perfect, and the issuance of the later patent in 1901 vested it with no other or higher right than it would have possessed had such instrument issued in 1880. We are unable to see how the second survey gives to, or takes from, either party to this controversy any right which might not have been insisted upon with equal effect had such survey never been made. Where a grant of land to a railway company, or for other scheme of public improvement, is in the nature of a float, and covers lands not surveyed into sections, and the tracts of land upon which the grant is to operate can not be known until officially surveyed, as was the case in the *United States v. Montana Lumber Company,* 196 U. S. 573 (25 Sup. Ct. 367, 49 L. Ed. 604), the title remains in the United States until such survey has been made.

But such is not here the case. The lands had been fully surveyed, and the sections, townships, and ranges definitely located and numbered at least seven years before the grant under which all of the parties to this controversy claim. The grant is couched in words giving it immediate present efficiency, and when once enacted, no right or title to said section remained in the government, except the right to insist upon the fulfillment of the specified conditions, and to declare a forfeiture upon the failure thereof. The company having performed the conditions, it was in position to sell and give good title to the entire section, or to any part or parcel thereof. The original survey and plat, as we have seen, showed lots one and two extending to the water's edge, and disclosed no meander line independent of the shore line. The company, as proprietor of all the land, had the entire right to accept that survey as satisfactory, and sell and convey the property with ref-

2. BOUNDARIES: meandered lakes: excess land: title: estoppel.

erence thereto, and the grantee in such conveyance could successfully assert his title thereunder to all of the land indicated against all comers; nor could a later survey, made at the instance of mere strangers or intermeddlers, subvert the right so acquired. The railway company did sell and convey lots one and two with reference to the original survey and plat which then stood unquestioned. That survey, we repeat, showed the north line and south line of section twenty-seven both closing upon meander posts planted upon the shore of the lake, and the meander between them coinciding with the shore which is clearly marked as constituting the east boundary of lots one and two. It has been said by the Supreme Court of the United States that: "It may be considered a canon in American jurisprudence that where the calls in a conveyance of land are for two corners at, in, or on a stream or its bank, and there is an intermediate line extending from one such corner to another, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise." *St. Clair v. Lovingston,* 90 U. S. 63 (23 L. Ed. 59).

In discussing a similar question in *Railroad Co. v. Schurmeier, supra,* the same court, referring to the original plat, says: "In preparing the official plat from the field notes the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not the meander line as actually run on the land, is the boundary." If, therefore, the railway company confessedly owned all of the land in this half section, whether within or without the meander line, and saw fit to recognize this rule, and make sale and conveyance of lots one and two according to the only official survey then existing, no other person was authorized to object thereto, or dispute the effectiveness of such conveyance to carry title to all of the lands to the water's edge, and most

certainly the grantor is in no position to raise such a
question.   This conveyance of the land according to the
original survey was an adoption of that survey for the pur-
poses of such transaction.  So far as the record in this case
is concerned there is not the slightest evidence that that
railway company supposed that it was reserving or retain-
ing the title to any part of this land bordering upon the
lake shore.   There is nothing whatever to show that it was
not fully aware of the alleged discrepancy between the
original survey and the actual area, or that it was in any
manner misled or deceived as to the true situation.   There
is nothing to show that from thence to this date it has
ever asserted the existence of any such mistake, or sought
its correction or a resurvey of the land.   The attack upon
the original survey and the demand for another were made
by parties having no right, actual, apparent, or prospective,
in the premises.   So far as is shown by the evidence the
attitude of the railway company with respect to that
proceeding was purely receptive.   It was making no claim
for itself, but if these strangers were willing to shake the
tree, it was not averse to appropriating any fruit which
might fall in its lap.   Its subsequent quitclaim to the ap-
pellee implies no assertion or affirmation of title in itself,
nor does it necessarily indicate any attempt on its part
to create or vest a title in appellee.   Its only effect is to
place the grantee in the shoes of the grantor, and if the
latter had no title, legal or equitable, the deed conveys none.
The stream can not rise higher than its source.   Let us
therefore inquire whether the railway company would be
barred or estopped from making this claim of title against
the appellants.

      This inquiry we are constrained to answer in the
affirmative upon at least two grounds:   First, the legal
effect of the conveyance by the railway company to the
land company in 1884; and, second, the adverse possession
of the premises in controversy by the appellants and their

grantors. The first of these propositions we have already treated at considerable length, and need only to add, by way of recapitulation: When this conveyance was made the original survey of the land with its plat and records had for nearly thirty years stood unchallenged. Both record and plat show lots one and two bounded upon the lake shore. This fact might perhaps have been of no binding significance as against a claim by the United States had the government not divested itself of title to the entire section, but as against the railway company which held title, legal and equitable, to all of the land, it is of decisive importance. The mistake, if one had been made, was as evident in 1884 as it was sixteen years later, when the call for a resurvey was made by a stranger. Without reservation or explanation said company, holding, as we have said, an indefeasible title to all of the land, saw fit to sell and convey these lots according to the original survey. For near twice the period of the statute of limitations it stood by and saw its successive grantees under said conveyance occupy all of the land up to the lake shore, claiming and using it as their own without protest or objection or any assertion or act of ownership upon its part, thus putting a practical construction upon its own deed, which is of the utmost significance. The most that can be said of this transaction is that the lots so conveyed may have contained more acres than the company supposed, and that the price received was less than it would have demanded had it been advised of the true acreage, though there is no testimony to this effect in the record, but such mistake, if any, does not affect the title conveyed.

It may be freely admitted that as between the government and the patentee or grantee of any portion of the public domain any mistake in the survey of the granted tract may be corrected in a proper proceeding for that purpose, if the effect thereof is to restore to the public do-

3. SAME: resurvey of patented land: jurisdiction.

main lands of which the government might otherwise be wrongfully deprived, and the genesis of the present controversy is doubtless in the mistaken notion that this rule is applicable as between the railway company and its grantees under the conveyance of 1884. But the rule thus conceded is not better established than is the other rule that where the government has parted with its title, and the controversy is wholly between persons asserting conflicting claims under grants or patents based upon the official survey, such survey is conclusive, even though as an engineering proposition it be grossly incorrect, and the land department has no more authority or jurisdiction to affect the rights of any party to such controversy, by directing a new survey or the issuance of a new patent, than it has to take cognizance of a boundary line dispute between adjacent farm owners who disagree as to the true location of a section line.

An instructive leading case upon this perhaps is *Cragin v. Powell,* 128 U. S. 691 (9 Sup. Ct. 203, 32 L. Ed. 566). There certain lands had been patented in part to individual purchasers, and in part to the State as swamp lands. A dispute arising between grantees of these titles, and action being brought in the said court to determine it, it was transferred to the federal court, which attempted to locate the lands by a new survey. On appeal it was sought to justify this judgment on the ground of the absence of any definite monument or date by which to ascertain the original line, except references in the original record to certain bayous and streams, and that the original survey was in general imperfect and incorrect. Overruling this proposition, and reversing the judgment of the trial court, it is said to be "a well-settled principle that when lands are granted according to an official plat of the survey of such lands, the plat itself, with all of its notes, lines, descriptions and landmarks becomes a part of the grant or

4. CONVEYANCES: reference to plat: effect.

deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out on the face of the deed or grant itself." Applying this rule to the case at bar, and assuming that the deed from the railway company to the land company and each successive deed in that line of title had described the land as "northwest quarter, and lots one and two in section twenty-seven, township ninety-seven, range thirty-five, being the land described in the official report of the government survey as follows, to wit [setting out in full the surveyor's note and plat, showing both the north and south lines closing on the lake and the eastern boundary coincident with the shore line]"—can there be any reasonable doubt that if the grantors in such deed owned all of the land up to the shore, it would all pass by such deed to its grantee? There can be no reasonable doubt that such would be its effect, and if for any reason the grantor did not have title to any part of the land so conveyed, and it subsequently acquired title, it would insure to the grantee's benefit. That the original survey, even though incorrect, is conclusive between individual buyers and sellers who deal with it on the basis of such survey. See *Stoneroad v. Stoneroad,* 158 U. S. 240 (15 Sup. Ct. 822, 39 L. Ed. 966); *Russell v. Maxwell,* 158 U. S. 253 (15 Sup. Ct. 827, 39 L. Ed. 971); *Horne v. Smith,* 159 U. S. 40 (15 Sup. Ct. 988, 40 L. Ed. 68); *Ufford v. Wilkins,* 33 Iowa, 110; *Kraut v. Crawford,* 18 Iowa, 549.

True the location of lines and corners as established by the official survey, when the subject of dispute, may be determined, as other questions of fact, but when any

5. CONVEYANCES: description: natural objects: course and distance.

given, fixed monument or natural object named in the survey is found, it must be respected, even though its location be out of harmony with the recorded measurements. "It is a universal rule that course and distance yield to natural and ascertained objects. A call

for a natural object, as a river, a spring, or even a marked line, will control both course and distance." *St. Clair v. Lovingston,* 90 U. S. 46 (23 L. Ed. 59). See, also, *Brown v. Milliman,* 119 Mich. 606 (78 N. W. 785). The last cited case is very much like the one before us in some of its essential features. There according to the government survey a meander post was set upon the shore of the lake. Later in attempting to trace this line the surveyor, following the minutes of course and distance as noted in the record of the original survey, located the meander corner seventeen chains west of the shore, but the court, recognizing the rule just quoted, held that the official survey was conclusive, and that the lake shore must be recognized as a monument fixing the boundary in that direction. To the same effect Judge Cooley says: "Where definite and permanent boundaries are given, the deed must be held to convey all land within those boundaries, notwithstanding the quantity is much greater than that mentioned." This is on the familiar principle that the incorrect portion of the description is to be rejected where that which remains is sufficient, and that definite and permanent monuments are to control distance and quantity. *Gilman v. Riopelle,* 18 Mich. 145. In the instant case the location of the first meander corner is designated as being at the intersection of the south line of the intersection of the lake, a fixed natural monument which can not be rejected in any controversy growing out of a conveyance of land according to the survey which it thus witnesses. Indeed, conceding, as the evidence tends to shows, that the location of both the southwest and northwest corners of the section have been definitely located, and that the lake still extends along the eastern border substantially as it did in 1856, we have every monument called for by the original survey, and the only discrepancy between this showing and the one made by the later survey is in the

length of the south line of the fractional section, and the difference thus resulting in the superficial area of the land included within the lines thus traced. We regard it clear that the railway company can not be heard to say that its conveyance of said lands according to the original survey was ineffective to vest in its grantee title to all of the land within the boundaries thereby established. This result is in no manner inconsistent with the rule laid down in *Grant v. Hemphill,* 92 Iowa, 218, and *Schlosser v. Hemphill,* 118 Iowa, 452. In each of those cases it was affirmatively established that no lake or body of water existed at the time of the survey justifying the use of a meander line, and as the natural monument on which the section lines were supposed to close had no existence, it followed of necessity that the so-called meander line must be treated as a boundary. But in this case there was a lake with a permanent well-defined shore line, and the precedents referred to have no application. The case comes rather within the rule of *Ladd v. Osborne,* 79 Iowa, 93, and *Schlosser v. Cruickshank,* 96 Iowa, 414.

Having found for the defendants upon the decisive propositions hereinbefore discussed, we do not think it necessary to determine the issue of adverse possession. For the reasons we have stated the decree quieting title in the plaintiff is erroneous, and the same is reversed. The appellee, if he so elects, will have a decree in this court confirming his title, otherwise the cause will be remanded to the district court for decree in harmony with this opinion.—*Reversed.*

McCLAIN, J., dissenting.—The meander line of the first survey so far departed from the actual shore line as it was at the date of such survey that within section 27 more than one hundred acres of land were left between them unsurveyed, and not taken into account in computing the areas of the adjoining lots for purposes of sale; and

defendants, as owners of lots one and two in the fractional northeast quarter of that section, claim a tract of land between the meander line and the shore line larger than either of those lots.  Now, while the case of *Schlosser v. Hemphill,* 118 Iowa, 452, may not be necessarily controlling because of the difference in the facts involved between that case and this, I should prefer to adopt, as applicable to this case, the language of that opinion, and say:  "We are further inclined to believe that when the meander line deviates from the true shore, as it does in this case from the bank of the body of water attempted to be bounded according to all the evidence and the concessions of counsel, the error would be so gross as to warrant a resurvey." The railroad company did not purport to convey to defendants' grantor any other land than that described in its deed, and if the meander line constituted, as I think it unquestionably did, under a reasonable interpretation of the decision in the case referred to, a boundary line, then the grant by the railroad company should be limited to the lots described in accordance with the original survey. In my opinion it is wholly immaterial that the railroad company was already entitled, at the time its deed to defendants' grantor was made, to any unsurveyed portion of the northeast quarter of the section.  It might grant that portion which was surveyed, or any part thereof, and retain its right to the balance.  When the subsequent survey was made, it was found that the railroad company was titled to further land in that quarter section, and in my opinion this land, between the meander line and the actual shore line, remained the property of the railroad company until granted to the plaintiff.

Under this state of facts I am unable to concur with the conclusion of the majority that the conveyance by the railroad company to the defendants' grantor of lots one and two carried with it the unsurveyed land between the

meander line and the shore line, a tract which, according to the second and correct survey is of the extent of more than forty-four acres, and I, therefore, dissent from the views expressed in the majority opinion.